IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER CHAN,<br><br>Defendant. | Case No. 22-cr-109-DKW<br><br>**ORDER DENYING DEFENDANT CHRISTOPHER CHAN'S MOTION TO SUPPRESS EVIDENCE** |

On August 16, 2022, after receiving citizen reports that Defendant Christopher Chan had engaged in "suspicious" and "unusual" behavior and was in possession of a large number of firearms, including "assault-style weapons," Honolulu Police Department ("HPD") officers prepared to conduct a "welfare check" at Chan's place of residence, the Wailana at Waikiki condominium complex ("Wailana"), on Ala Moana Boulevard. Before HPD could perform the check, they encountered Chan driving his vehicle out of the Wailana parking garage. An HPD officer approached on foot, directed Chan to stop and exit his vehicle, and unsuccessfully attempted to open the driver's side door when Chan did not comply. In response, Chan accelerated, colliding with an HPD vehicle as he sped away.

1

Over the next several minutes, in the course of fleeing to a nearby condominium complex that was home to his mother, Chan struck numerous vehicles and threatened the safety of many pedestrians in the Ala Moana corridor. HPD officers finally cornered and apprehended him while in his vehicle in the garage of his mother's residence. Upon receiving information that Chan was in possession of a black tactical rifle bag—in apparent violation of Hawaiʻi's "Place to Keep" statute—officers searched his vehicle without a warrant and discovered the rifle bag in the trunk. Inside the bag, officers found a short-barrel rifle complete with 30 rounds loaded in a magazine. On November 17, 2022, Chan was indicted by a federal grand jury for possession of an unregistered firearm. Dkt. Nos. 34, 47.

Chan now moves to suppress the firearm evidence, contending both (i) that the officers' attempt to detain him at the Wailana violated the Fourth Amendment and tainted the later search of his vehicle, and (ii) that the vehicle search itself violated the Fourth Amendment because it was done without a warrant and was not justified by exigent circumstances. Dkt. No. 41 ("Motion").

As explained below, Chan's Motion is DENIED. First, in directing Chan to stop and exit his vehicle, the officers did not "seize" Chan within the meaning of

the Fourth Amendment.[1]  Further, the warrantless search of Chan's vehicle at his mother's condominium was permissible under the "automobile exception" because the officers had probable cause to believe the vehicle contained evidence of a crime; exigency is not a prerequisite for that exception to apply.

## LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[2]  The touchstone of the Fourth Amendment is reasonableness.  *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973).  If evidence of a crime is obtained via an unreasonable search or seizure in violation of the Fourth Amendment, the exclusionary rule may forbid the use of such improperly obtained evidence at trial.  *Herring v. United States*, 555 U.S. 135, 139 (2009).  "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'"  *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (internal quotation marks and citation omitted).

---

[1]*See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("[T]he Fourth Amendment . . . does not remotely apply [] to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee."); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844–45 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment.").
[2]The Fourth Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643 (1961).

## RELEVANT FACTUAL ALLEGATIONS

**I.      HPD receives reports of Chan's erratic behavior.**

On August 12, 2022, HPD received an email from the General Manager ("GM") of the Wailana, requesting police assistance regarding Chan, a Wailana resident.  Dkt. No. 45 at 2; Dkt. No. 56, Transcript of Evidentiary Hearing ("Evid. Tr.") at 8:18–21; Dkt. No. 51, Exh. 1 (GM's email).  The GM stated in the email that he had received reports of "suspicious behavior" by Chan, thought Chan may be suffering from mental illness, and understood Chan to be in possession of "a large number of firearms" in his unit.  *Ibid.*

On August 16, 2022, HPD Officers Jonathan Rakieten and Raymond Do responded.  During an interview, the GM informed the officers that he had received numerous resident complaints about Chan since approximately May 2022. Evid. Tr. at 12:15.  Residents had complained that (i) Chan had stated that people were "tracking him" and that neighbors were "attacking him with radio or other frequency waves"; (ii) Chan had looked into a female resident's bedroom window and filmed her; (iii) Chan had attempted to kick down neighbors' doors; and (iv) neighbors were afraid to report these incidents to HPD for fear of reprisal by Chan. *Id.* at 83:25–84:12; Dkt. No. 51, Exh. 2 (GM's written statement); Dkt. No. 45 at 2–3.

The GM also informed officers that he had received a concerning report from a Wailana maintenance worker (the "Worker").  Dkt. No. 51, Exh. 2; Dkt. No. 51, Exh. 3 (Worker's written statement).  The Worker had told the GM that, several months prior, while he was performing air-conditioning service in Chan's unit, he had observed a large number of "assault style" or "military style" firearms, "wrapping around the wall" of the unit.  Dkt. No. 51, Exh. 3.  More recently, after the Worker had heard rumors about a resident with mental illness who was scaring other residents, he encountered Chan in the Wailana elevator "acting very strangely" and "[t]alking about world take over, defend yourself by any means, apocalypse type things."  *Id.*  The Worker recognized Chan as the individual with the firearms in his unit and notified the GM.  *Id.*  HPD officers contacted the Worker, confirmed his observations, and obtained his written statement.  *Id.*

Additionally, the Wailana GM informed officers that, in July 2022, he had spoken to Chan's father, who told him Chan was investigating a satanic cult being run inside the building, which Chan believed was trying to use him as a human sacrifice.  Dkt. No. 51, Exh. 2.  Chan's father explained that Chan had not wanted to submit a written complaint to law enforcement because he believed the HPD and FBI were involved in the cult.  *Id.*; Evid. Tr. 11:13–16.

HPD officers conducted a background check and found that Chan had no firearms registered in his name.  Evid. Tr. at 14:15.  They also learned that Chan

was the subject of numerous recent HPD police reports, some of which indicated that he had violent or threatening tendencies. *See id.* at 13:2–14:2.[3] They also discovered that Chan owned a grey 2012 Toyota Camry with Hawaiʻi license plate ADFX-01 ("Vehicle") registered in his name. *Id.* at 15:1–20. Upon inquiry, the GM told the officers the Vehicle would likely be parked on the second floor of the parking structure, which the officers subsequently confirmed. *Id.* The officers, in fact, were able to see through the Vehicle's closed windows. In plain view, they saw a box addressed to another person sent from a company known to distribute firearms parts. *Id.* at 15:16–25.

After this initial investigation, Officer Rakieten concluded that HPD "needed to take action immediately." *Id.* at 18:24–25; *ibid.* at 12:10–13 (Rakieten testifying he believed Chan's neighbors "were extremely stressed out about this situation, and [] feared for their safety, so much so that they were not willing to call law enforcement to assist them"); *ibid.* at 13:23–14:2 (Rakieten testifying that the information showed Chan had "violent tendencies and behaviors" and that "he was becoming a danger to others as well"). He informed his supervisor, who then

---

[3]While the content of these reports was not provided in detail, Officer Rakieten described one incident about a year ago in which Chan believed nobody was listening to him. Chan stated that "he was going to be in the media, and if anybody got in his way they were not going to go home to their families." Evid. Tr. at 13:12–17. Officer Rakieten described a second report about a month ago involving "an unprovoked assault that occurred in the Zippy's parking lot by [Chan]." *Id.* at 13:18–21. Rakieten concluded that the general nature of these reports indicated Chan was "threatening and violent." *Id.* at 13:2–9.

developed an operational plan to conduct a "welfare check" at Chan's residence to determine whether Chan should receive a mental health evaluation in accordance with Hawai'i's emergency mental health statute, Hawai'i Revised Statutes ("HRS") § 334-59.[4]

## II.   As Officers approach, Chan speeds away, damaging property and jeopardizing the safety of the community.

On August 16, 2022, shortly before 2:00 p.m., Officers Rakieten and Do, along with six other HPD officers, began to stage for the welfare check at the Wailana, mindful of Chan's reported cache of assault-style weapons.  One officer

---

[4]HRS § 334-59 authorizes police officers to take a person into custody involuntarily for psychiatric treatment if they the person is an imminent danger to himself or others.  The statute provides:

> (a) Initiation of proceedings. An emergency admission may be initiated as follows:
>
> (1)  If a law enforcement officer has reason to believe that a person is imminently dangerous to self or others, the officer shall call for assistance from the mental health emergency workers designated by the director.  Upon determination by the mental health emergency workers that the person is imminently dangerous to self or others, the person shall be transported by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization.  A law enforcement officer may also take into custody and transport to any facility designated by the director any person threatening or attempting suicide.  The officer shall make application for the examination, observation, and diagnosis of the person in custody.  The application shall state or shall be accompanied by a statement of the circumstances under which the person was taken into custody and the reasons therefor which shall be transmitted with the person to a physician, advanced practice registered nurse, or psychologist at the facility.

HRS § 334-59(a)(1).  Officer Rakieten is trained in the procedures implicated by this statute. *See* Evid. Tr. at 7:2–6, 11–19.

was tasked with locating Chan's Vehicle to determine whether it was still parked on the second floor of the parking garage and whether Chan was likely at home. Upon initiating that check, the officer observed the Vehicle heading for the exit of the garage, operated by a male. *Id.* at 21:16–22.  He notified Officer Rakieten.  *Id.*

Shortly thereafter, Rakieten and an unnamed officer on the ground floor sighted the Vehicle as it approached the garage exit at a slow rate of speed, identifying Chan as the driver and sole occupant. *Id.* at 22:10–12.  Rakieten approached the driver's side window while the other officer approached on the passenger side.  Dkt. No. 51, Exh. 4 (Officer Rakieten's body-worn camera footage of the encounter).  As Rakieten approached, he held his hand up, palm-out, and ordered Chan to stop and "come out of the Vehicle." *Id.*  Chan paused momentarily. *Id.*; *see also* Evid. Tr. at 32:11–33:2 (Rakieten testifying that the vehicle stopped briefly).  As Rakieten neared the driver's side window, he again instructed Chan to "come out of the Vehicle" and attempted to open the driver's side door by pulling on the handle when Chan did not comply.  Dkt. No. 51, Exh. 4.[5]  As Rakieten did so, Chan accelerated at a high rate of speed, driving away

---

[5]*See also* Evid. Tr. at 23:23–24; 25:2–19 (Rakieten testifying that he "attempted to open the door to the Vehicle when [Chan] refused to come out on his own," in an effort "[t]o detain" Chan "[f]or safety reasons"); *ibid.* at 25:5–19 (Rakieten testifying that a "vehicle can be a deadly weapon and based on the facts and circumstances that we had at this moment already," including that "there [wa]s a high probability he [wa]s in possession of firearms," he believed "[Chan] could be a danger to himself and others" and there was "an immediate or imminent threat").

from the parking garage and colliding with a marked police SUV on his way out.
*Id.*[6]

In the minutes following Chan's departure from the Wailana, HPD received
numerous 911 calls that Chan's Vehicle had struck multiple other vehicles and fled
the scenes of those accidents along Ala Moana. The reports also described Chan as
driving hazardously on a sidewalk, nearly striking multiple pedestrians. Evid. Tr.
at 29:1–30:8. HPD issued an "all-points bulletin," instructing all HPD officers to
be on the lookout for Chan and indicating that he may be armed and dangerous.
*Id.* at 28:1–13.

## III.   Officers locate and arrest Chan.

At about 2:40 p.m., officers located and apprehended Chan at another
condominium complex where his parents reside, Uraku Tower at 1341 Kapiolani
Boulevard. *Id.* at 30:14–25. At the time he was apprehended, Chan was operating
the damaged Vehicle, attempting to exit the Uraku Tower parking structure. *Id.*
HPD Sergeant Kendrick Tahara and Officer David Kuaʻana positively identified

---

[6]*See also* Evid. Tr. at 24:20–25; 25:6–10 (Rakieten testifying, "Chan did not behave as a
reasonable person would when being ordered to be stopped by a police officer. He was jittery,
uncooperative, and did not listen to my instructions . . . [t]o stop and come out of the vehicle.");
*ibid.* at 42:6–13 (Officer David Kuaʻana testifying, "I remember seeing a vehicle or hearing the
engine and the vehicle—the tires screeched, it propelled forward in an aggressive manner and it
left the garage, it made a right-hand turn onto Ena Road, and it struck a parked patrol vehicle.").

Chan as the lone occupant of the Vehicle, handcuffed him without incident, and placed him under investigative detention. *Id.* 46:3–24; 48:1–6.[7]

Chan's Vehicle remained in the driveway of the Uraku Tower parking structure, obstructing traffic flow. *Id.* at 48:8–17; 49:22–50:2 (Officer Kuaʻana explaining that, while the Vehicle was awaiting impoundment, it "was left right in the middle of the exit lane, so no other vehicles could leave the property at that time"); *see also* Dkt. No. 51, Exh. 5 (photo of Chan's collision-damaged Vehicle blocking the parking garage exit).

## IV.   Officers search Chan's Vehicle upon reports of his possession of a long gun and discover a short-barrel rifle loaded with 30 rounds of ammunition.

At approximately 2:50 p.m. on August 16, 2022, HPD Officer Jason Yee Hoy interviewed Chan's mother. She described Chan as prone to getting extremely upset and violent. Evid. Tr. at 59:4–18; 64:8–9.

Officer Yee Hoy also interviewed the Uraku Tower Security Officer. The Security Officer stated that at approximately 2:15 p.m., he was seated at the front desk when Chan entered the lobby "in a state of panic" and "in a state of shock and kept saying 'They're going to kill me!' multiple times." Dkt. No. 51, Exh. 6 (Security Officer's written statement). The Security Officer also relayed that

---

[7]At this point, Officer Rakieten contacted HPD's on-call psychologist and obtained a concurrence from the doctor to have Chan approved for an emergency mental health screening and transport to a hospital. Evid. Tr. at 31:14–18. Rakieten then transported Chan to Queen's Medical Center for psychiatric evaluation. *Id.*

Chan's father had come to the lobby to try to calm Chan down. *Id.* Chan's father and Chan talked outside and then went to the basement parking structure, with the Security Officer finally asking Chan to leave the premises because of his disruptive behavior. *Id.*

Officer Yee Hoy then interviewed the Uraku Tower Building Manager who reported that, at approximately 2:00 p.m., he had observed Chan enter the building lobby holding a black tactical rifle bag, which looked like it contained a rifle due to the rigidness of the bag. Evid. Tr. at 66:16–67:14; Dkt. No. 51, Exh. 7 (Building Manager's written statement). The Building Manager also asked the officers to remove Chan's Vehicle from the premises. *See* Dkt. No. 45 at 8.

At approximately 3:38 p.m., while the Vehicle was still blocking traffic out of the Uraku Tower parking garage, Officer Yee Hoy performed a warrantless search of the Vehicle and discovered the black rifle bag described by the Building Manager inside the Vehicle trunk. Evid. Tr. at 54:23–55:10; 85:24. Officer Yee Hoy opened the bag and found a "black tactical AR-style rifle" with a short barrel and no serial number or other manufacturer markings, loaded with 30 rounds of ammunition. *Id.* at 71:16–72:20; Dkt. No. 51, Exh. 8 (photo of the rifle bag, rifle, and ammunition). Upon recovery of the firearm, HPD transferred the case to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Dkt. No. 45 at 9.

## **RELEVANT PROCEDURAL BACKGROUND**

On August 18, 2022, Chan was charged by criminal complaint with one count of possession of an unregistered firearm—namely, a rifle containing no serial number or appropriate manufacturer markings and a barrel measuring approximately 10.5 inches in length—in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.  Dkt. No. 1.[8]  On November 17, 2022, a grand jury indicted Defendant on the same charge, Dkt. No. 34, with a superseding indictment following roughly a month later.  Dkt. No. 47.  Trial is scheduled to begin on March 20, 2023.  *See* Dkt. No. 44.

On December 5, 2022, Defendant filed the instant Motion to suppress the firearm evidence at trial.  Dkt. No. 41.  On December 20, 2022, the Government opposed, Dkt. No. 45, and on December 27, 2022, Chan replied.  Dkt. No. 54.

The Court presided over a December 29, 2022 evidentiary hearing on this matter.  *See* Dkt. No. 56.  During the hearing, the Government presented the sworn testimony of three witnesses—Officers Rakieten, Kua'ana, and Yee Hoy—with defense counsel cross-examining each of them.  *See id.*  The Court also admitted eight exhibits without objection.  Dkt. No. 51, Exhs. 1–8.  Following witness

---

[8]As indicated in the criminal complaint, Dkt. No. 1, ATF agents physically examined the rifle and measured the barrel length to be approximately 10.5 inches.  Under 26 U.S.C. § 5845(a)(3), a "firearm" includes a "rifle having a barrel . . . . of less than 16 inches in length[.]"

testimony, both parties offered oral argument, after which the Court directed the parties to submit supplemental briefing.

On January 4, 2023, Chan submitted a supplemental memorandum, Dkt. No. 57, and on January 11, 2023, the Government submitted its response. Dkt. No. 58. The Court has carefully considered the parties' arguments and evidence, and this Order now follows.

## DISCUSSION

Chan asserts that the firearm evidence should be suppressed at trial for two reasons. First, he claims that "the warrantless attempt to seize [him] while [he] was in the parking lot of his residence at the Wailana" was unconstitutional and, thus, the later Vehicle search at the Uraku Tower should be suppressed as fruit of the poisonous tree. Dkt. No. 54 at 2. Second, he challenges, in its own right, the Vehicle search because it was conducted without a warrant and absent exigent circumstances. *See* Dkt. No. 57 at 4-5. As discussed below, neither defense contention merits suppression.

I.    **HPD did not seize Chan at the Wailana parking garage and, even if they had, HPD's later search was attenuated by Chan's independent actions.**

A.    The encounter at the Wailana was not a seizure and was, thus, not subject to the Fourth Amendment.

The U.S. Supreme Court has advised that there are two types of Fourth Amendment seizure: "seizure by force" and "seizure by acquisition of control."

*Torres v. Madrid*, 141 S. Ct. 989, 998 (2021).  The former occurs when police make a show of authority, combined with some "use of force with intent to restrain."  *Id.*  This type encompasses "a laying on of hands or application of physical force to restrain movement, even when it is unsuccessful," or "merely touching, however slightly, the body of the accused, by the party making the arrest and for that purpose, [even if] he does not succeed in stopping or holding him even for an instant."  *California v. Hodari D.*, 499 U.S. 621, 625–27 (1991).  It does *not* encompass "[a]ccidental force . . . [or] force intentionally applied for some other purpose."  *Torres*, 141 S. Ct. at 998.  The latter type occurs when police make a show of authority and the arrestee "submi[ts] to the assertion of authority."  *Hodari D.*, 499 U.S. at 626; *see also Torres*, 141 S. Ct. at 1001 ("[A] seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement.");  *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Precedent instructs that where an individual flees from police, no submission occurs until the defendant is physically subdued.").  Neither type of seizure includes encounters where an officer directs a person to "Stop!" and the person flees or otherwise refuses to comply.  *Hodari D.*, 499 U.S. at 626.[9]  Nor does it include "[a]ttempted seizures."  *Cnty. of Sacramento*

---

[9]*See United States v. Betancur-Bustamante*, 1986 WL 20840 at *4 (9th Cir. Sep. 16, 1986) (unpublished disposition) ("[L]aw enforcement officials do not violate the Fourth Amendment merely by approaching an individual in a public place [and] asking him if he is willing to answer some questions . . . .");  *Hodari D.*, 499 U.S. at 626 (holding it was no seizure for police officers

*v. Lewis*, 523 U.S. 833, 844–45 n.7 (1998).  In sum, "[t]here can be no arrest without either touching or submission."  *Hodari D.*, 499 U.S. at 626–27.

Here, neither a "seizure by force" nor a "seizure by acquisition of control" took place at the Wailana parking garage.  With regard to the former, although Officer Rakieten commanded Chan to stop and exit his vehicle, no officer touched Chan, drew a weapon, or applied any force upon him.  Dkt. No. 51, Exh. 4.  Rakieten's failed attempt to open the Vehicle door did not constitute "a laying on of hands" or "touching . . . the body of the accused."  *See Hodari D.*, 499 U.S. at 625–27.  Nor did it constitute "use of force with intent to restrain."  *See Torres*, 141 S. Ct. at 998.  As Rakieten testified, his only aim was to open the car door.  Evid. Tr. at 23:23–24; 25:2–19.  As evidenced by the body camera footage, Rakieten had not yet reached the point where he might have attempted to touch Chan.  *See id.*; *Torres*, 141 S. Ct. at 998 (excluding "force intentionally applied for some other purpose"); *Lewis*, 523 U.S. at 844–45 n. 7 (excluding "[a]ttempted seizures").

With regard to the latter type, there was no "voluntary submission . . . or termination of freedom of movement," and Chan was not "physically subdued."

---

to command a person to stop and chase him, without probable cause, for no other reason than that he ran away at their approach); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (holding a 20-mile high-speed car chase was not a seizure); *United States v. McClendon*, 713 F.3d 1211, 1216 (9th Cir. 2013) (holding that a defendant was not seized when officers drew their guns, told him he was under arrest, and ordered him to stop and put up his hands, whereupon he turned and walked away, not holding up his hands).

*See Torres*, 141 S. Ct. at 1001; *McClendon*, 713 F.3d at 1215.  Although Chan paused momentarily—as he was easing out of the parking garage and while Rakieten passed in front of his Vehicle—Chan quickly proceeded to ignore Rakieten's instructions and flee, in clear *non*-submission to Rakieten's show of authority.  Dkt. No. 51, Exh. 4.  Chan characterizes this encounter as a "traffic stop."  *See* Dkt. No. 57 at 3.[10]  But a traffic stop is defined as the "[t]emporary detention of individuals during the stop of an automobile by the police . . . ."  *Whren v. United States*, 517 U.S. 806, 809–10 (1996).  Chan, however, was not detained; he sped away.  Upon seeing approaching police, a driver's momentary removal of his foot from the gas pedal while he contemplates what to do, just before accelerating away, is not submission.

B.  Even if the encounter at Wailana *had* been a seizure, it was supported by the requisite reasonable suspicion that criminal activity was afoot.

In *Terry v. Ohio*, 392 U.S. 1, 22 (1968), the Supreme Court explained that, in order to temporarily detain a person for an investigative stop, officers need only "reasonable suspicion"—"articulable suspicion that a person has committed or is about to commit a crime."  *See id.*; *United States v. Woods*, 720 F.2d 1022, 1026

---

[10]*See* Dkt. No. 57 at 3 ("[A] reasonable articulable suspicion did not exist to justify expanding the scope of the welfare check to a traffic stop where Chan was ordered out of his vehicle."); *ibid.* ("In the case at bar, the seizure of Chan at the Wailana was unlawful because it was initiated in the absence of a traffic violation on private property without specific objective facts to support a reasonable suspicion that criminal activity was afoot.  The pretext of a 'welfare check' did not authorize the use of force against Chan or his detention.").

(9th Cir. 1983) (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).  Reasonable

suspicion requires "something 'more substantial than inarticulate hunches' . . . [or]

simple 'good faith on the part of the arresting officer," but it does not require

probable cause.  *Terry*, 392 U.S. at 22.  As relevant here, *Terry* explained the basis

of this standard:

> Street encounters between citizens and police officers are incredibly
> rich in diversity.  They range from wholly friendly exchanges of
> pleasantries or mutually useful information to hostile confrontations
> of armed men involving arrests, or injuries, or loss of life.  Moreover,
> hostile confrontations are not all of a piece.  Some of them begin in a
> friendly enough manner, only to take a different turn upon the
> injection of some unexpected element into the conversation.
> Encounters are initiated by the police for a wide variety of purposes,
> some of which are wholly unrelated to a desire to prosecute for crime.

*Id.* at 13.  Thus, although, typically, seizures require a warrant or probable cause,

there are times when, under the "entire rubric of police conduct," to include

"necessarily swift action predicated upon [] on-the-spot observations of the

officer," police conduct "historically has not been, and as a practical matter could

not be, subjected to the warrant procedure."  *Id.* at 21.  In a later case, the Supreme

Court further elaborated:

> The predicate permitting seizures on suspicion short of probable cause
> is that law enforcement interests warrant a limited intrusion on the
> personal security of the suspect.  The scope of the intrusion permitted
> will vary to some extent with the particular facts and circumstances of
> each case. . . .  [A]n investigative detention must be temporary and
> last no longer than is necessary to effectuate the purpose of the stop.

*Royer*, 460 U.S. at 500.

Here, at the moment Chan was exiting the Wailana parking garage on

August 16, 2022, officers knew:

- A maintenance worker had seen a large number of "military style" firearms in Chan's unit the prior year, "wrapping around the wall." Dkt. No. 51, Exh. 3.

- Individuals who retain firearms typically do so for long periods of time. Evid. Tr. at 80:13–20.

- No firearms were officially registered in Chan's name. Evid. Tr. at 14:15.

- Chan's Vehicle contained a package from a known firearms dealer. *Id.* at 15:16–25.

- Chan had been reported to be engaged in dangerous, erratic, and otherwise concerning behavior, including attempting to kick down neighbors' doors, filming through a female resident's bedroom window, telling neighbors he was being tracked by radio frequency waves, ranting to the Worker about "world take over, defend yourself by any means, apocalypse type things," telling his father that he was investigating a satanic cult in the building that he believed wanted to use him as a human sacrifice, unprovokedly assaulting a female citizen in a Zippy's parking lot, and reporting to the HPD that "he was going to be in the media, and if anybody got in his way they were not going to go home to their families." *See supra*, Relevant Factual Allegations.

- Fellow residents were afraid of Chan. Dkt. No. 51, Exh. 2.

Based on these facts, the officers were justified in reasonably suspecting that Chan

was in possession of an unregistered firearm, among myriad other crimes. Thus, in

the circumstances under which the officers encountered Chan in his Vehicle

leaving the Wailana, law enforcement interests warranted a limited intrusion on

Chan's personal security for the purposes of an investigative stop.  *See Royer*, 460 U.S. at 500.

C.  Moreover, even if Rakieten's conduct *had* constituted an
     unconstitutional seizure, the taint from such a seizure was attenuated
     by Chan's subsequent actions.

Under the "attenuation doctrine," even if an initial seizure is unconstitutional, a person's subsequent voluntary activities may independently justify a future search, such that the fruits from the initial seizure are not considered "poisonous."  *Strieff*, 579 U.S. at 238.  As an example, in *United States v. Garcia*, 516 F.2d 318, 319 (9th Cir. 1975), police attempted to stop the defendant at a border checkpoint.  Rather than submitting, the defendant sped away, giving police probable cause for their search of his vehicle.[11]  *Id.* at 319. Police pursued the defendant on the basis of his flight and found marijuana inside his vehicle.  *Id.*  The Ninth Circuit assumed, without deciding, that the border stop had been unconstitutional, but nonetheless held that the search was permissible because the defendant's voluntarily flight was the independent source of probable cause for the search.  *Id.*; *see also McClendon*, 713 F.3d at 1218 (applying the attenuation doctrine where the illegality was not the but-for cause of the evidential discovery); *United States v. Valencia-Barragan*, 819 F. App'x 508, 510 (9th Cir.

---

[11]*See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

2020) (unpublished disposition) (holding that the defendant's "subsequent flight from law enforcement constituted an intervening act that purged the taint from any prior illegality").

This doctrine applies in full force here.  Upon being directed to stop at the Wailana, Chan instead fled, drove recklessly, collided with a police vehicle and numerous other vehicles, fleeing the scenes of those accidents, drove on a sidewalk and nearly struck multiple pedestrians, and carried a rifle concealed in a black tactical rifle bag through the lobby of a condominium complex where he did not reside in apparent violation of Hawai'i's "Place to Keep" statute.[12]  *See supra*, Relevant Factual Allegations.  As discussed more fully below, these actions independently justified the later Vehicle search at the Uraku Tower, and they thus purged the taint from any illegality during the initial Wailana encounter.

---

[12]Hawai'i's "Place to Keep" statute, HRS § 134-24, provides, in relevant part:

> (a) [A]ll firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:
>
> > (1) A place of repair;
> > (2) A target range;
> > (3) A licensed dealer's place of business;
> > (4) An organized, scheduled firearms show or exhibit;
> > (5) A place of formal hunter or firearm use training or instruction; or
> > (6) A police station.

II.     **The "automobile exception" to the Fourth Amendment's warrant requirement authorized the search of Chan's Vehicle.**

Generally, the Fourth Amendment prohibits warrantless searches of private property without consent.  *Cady*, 413 U.S. at 439 ("[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." (quoting *Camara v. Municipal Ct.*, 387 U.S. 523, 528–29 (1967)).  However, automobile searches constitute an exception to this general rule: "The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."  *California v. Acevedo*, 500 U.S. 565, 580 (1991) (citing *United States v. Ross*, 456 U.S. 798, 824 (1982)).

Notably, though the "ambulatory character" of automobiles—and, thus, the immediacy of the need for police action in many circumstances—was a factor in the Supreme Court's jurisprudence *developing* this exception, *see Cady*, 413 U.S. at 440–42, 447,[13] the availability of the automobile exception does not depend on exigency.  *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) ("[U]nder our established precedent, the 'automobile exception' has no separate exigency requirement.") (citing *Ross*, 456 U.S. at 809).  Accordingly, factors such as

---

[13]This exception stems both from "the ambulatory character" of automobiles and from the regularity with which, and diversity of reasons why, police come into contact with citizens and their vehicles.  *Cady*, 413 U.S. at 440–42 (police-citizen-vehicle contacts occur when police investigate criminal activity and execute their "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to" a crime).

whether an automobile is in the exclusive control of the police, or whether officers have the time and opportunity to safely obtain a warrant, are irrelevant to whether the exception applies. *See id.*; *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) ("Because this exception is justified by the exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles, the applicability of the automobile exception does not turn on whether the car's owner or driver has already been taken into custody or the risk of mobility has otherwise been eliminated . . . .").[14]  Rather, the *only* relevant question is whether probable cause exists—whether the facts "would justify the issuance of a warrant, even though a warrant has not actually been obtained." *Ross*, 456 U.S. at 809; *Acevedo*, 500 U.S. at 580.

"Probable cause exists if there is a fair probability that contraband or evidence of a crime will be found in a particular place . . . ." *United States v. Faagai*, 869 F.3d 1145, 1150 (9th Cir. 2017) (internal quotation marks and citation omitted).  In turn, "[w]hether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question.  Neither certainty nor a preponderance of the evidence is required." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (internal

---

[14]*See also Paredes*, 388 F. Supp. 2d 1185, 1196–97 (D. Haw. 2005) ("The Supreme Court has repeatedly stated that a warrantless search of a car (1) need not occur contemporaneously with the car's lawful seizure and (2) need not be justified by the existence of exigent circumstances that might have made it impractical to secure a warrant prior to the search.").

quotation marks and citations omitted); *United States v. Crozier*, 777 F.2d 1376, 1380 (9th Cir. 1985) (allowing for a "common-sense and realistic" assessment of the relevant facts and circumstances).  The existence of probable cause is determined by "looking to the collective knowledge of all the officers involved in the criminal investigation," not only the information available to the person who actually took the challenged action.  *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (internal quotation marks and citation omitted).

The automobile exception applies to the Uraku Tower search here because, at the time Officer Yee Hoy searched Chan's Vehicle, HPD officers had probable cause to believe that the Vehicle contained evidence of a criminal violation of Hawaiʻi's "Place to Keep" statute.  *See* HRS § 134-24 (statutory text provided *supra*, at 20 n.12).  At the time that Officer Yee Hoy searched the Vehicle, officers knew:

- The Wailana maintenance worker had observed a large number of "military style" firearms in Chan's unit the prior year, "wrapping around the wall."  Dkt. No. 51, Exh. 3.

- Individuals who retain firearms typically do so for long periods of time.  Evid. Tr. at 80:13–20.

- Earlier that day, on August 16, 2022, Chan's Vehicle had contained a package from a known firearms dealer.  *Id.* at 15:16–25.

- Chan exhibited a pattern of dangerous and erratic behavior, as described in Discussion, Section I.B., *supra*.

23

- Chan had fled from law enforcement, striking multiple vehicles and fleeing from the scenes of those accidents, and had driven on a sidewalk, nearly striking pedestrians.  Evid. Tr. at 29:–30:8.

- Chan's mother said Chan is known to get extremely upset and violent.  *Id.* at 59:4–18; 64:8–9.

- Chan's father said Chan was investigating a satanic cult that he thought was trying to use him as a human sacrifice.  Dkt. No. 51, Exh. 2.

- Chan entered the Uraku Tower lobby in a state of "shock" and "panic," repeatedly saying "They're going to kill me."  Dkt. No. 51, Exh. 6.

- Chan had told the maintenance worker about "world take over," and "defend yourself by any means."  Dkt. No. 51, Exh. 3.

- Shortly before being arrested, Chan had been carrying a rigid-looking black tactical rifle bag through the Uraku Tower lobby. Dkt. No. 51, Exh. 7.

- People often carry firearms for "protection."  Evid. Tr. at 60:3–5.

- Uraku Tower was not Chan's place of residence, nor was it a place of purchase, a place of repair, a target range, a licensed dealer's place of business, a place of formal training or instruction, a firearms show, or a police station.  *See* HRS § 134-24.

The reasonable inference from these facts is that Chan was carrying a rifle through the Uraku Tower condominium complex for protection against what he viewed as a real threat to his safety.  Moreover, as there was no evidence that Chan had discarded the rifle bag or given it to someone else before getting in his Vehicle, *see* Evid. Tr. at 69:3–18, the reasonable, common-sense inference was that the rifle was in the Vehicle.  As police were aware that Chan lived at the Wailana, not the

Uraku Tower, and the Uraku Tower was not one of the other locations in which a person is authorized to carry a weapon under Place to Keep, Chan's possession of a firearm at that location would have violated that statute. *See* HRS § 134-24. In other words, the totality of the circumstances supported a "fair probability" that contraband or evidence of a crime would be found in the Vehicle, and probable cause existed. *See Kelley*, 482 F.3d at 1050.[15]

Chan argues that some of the information cited above was "stale" or "dated," rendering that information invalid for the purpose of justifying probable cause. *See* Dkt. Nos. 41 at 3; 57 at 2. Chan is mistaken. "Information underlying a warrant is not stale if there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013)); *see also United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) ("[T]he mere lapse of substantial amounts of time is not controlling in a question of staleness."). Here, the information on which officers relied was part of a consistent pattern, much of which was substantiated and very recent. In fact, the allegedly stale report from the maintenance worker of Chan's cache of weapons in his unit, by itself, likely

---

[15]As discussed above, precedent precludes Chan's argument that the exception should not apply because the Vehicle was in the exclusive control of police, giving them time to obtain a search warrant. *See* Dkt. No. 57 at 4; *Dyson*, 527 U.S. at 466 ("[U]nder our established precedent, the 'automobile exception' has no separate exigency requirement."); *Scott*, 705 F.3d at 417 (similar); *Paredes*, 388 F. Supp. 2d at 1196–97 (similar).

would not have been acted on by police without more.  It was only in the context of the additional and more recent information and facts bulleted above, most of it nearly contemporaneous with Chan's arrest, and none of which could even arguably be considered "stale," that the law enforcement and probable cause picture became clear.

Chan also contends that the police were only allowed to search the space in his Vehicle within his "immediate control."  Dkt. No. 57 at 5.  In support, he cites to *Arizona v. Gant*, 556 U.S. 332, 351 (2009), which held that, when police search a vehicle after arresting the driver, they may only search the areas of the vehicle that are within reaching-distance of the arrestee.  *Id.*  *Gant* is inapposite.  That case applied to officers' search of a vehicle when there *was no* probable cause—when, therefore, the automobile exception did not apply—and the officers' only authority to search without a warrant came from a *different* warrant exception: the one for safety-related searches incident to an arrest.  In those cases, police may search only areas within the arrestee's immediate control because those are the areas justifying a safety-related concern.  *See id.*  Here, where probable cause did exist, the automobile exception allowed police to search "any area of the vehicle in which the evidence might be found."  *See id.* at 347 (reaffirming this principle for the automobile exception).

Chan finally contends that, even if officers were allowed to search the

Vehicle itself, they were not allowed to open the rifle bag and examine its contents.

In support, Chan cites to *United States v. Chadwick*, 433 U.S. 1, 11 (1977), which

held that, during an otherwise permissible automobile search, police should not

have searched a "double-locked footlocker" found inside the defendant's car

because the defendant had manifested an expectation of privacy by locking his

belongings in the footlocker.  Dkt. No. 57 at 4-5 (also citing *Arkansas v. Sanders*,

442 U.S. 753, 763–66 (1979), which extended *Chadwick*'s reasoning to a suitcase

located in the trunk of a car).  Again, Chan is mistaken.  The Supreme Court

specifically abrogated the *Chadwick-Sanders* rule in 1991:

> We conclude that it is better to adopt one clear-cut rule to govern
> automobile searches and eliminate the warrant requirement for closed
> containers. . . .  The police may search an automobile and the
> containers within it where they have probable cause to believe
> contraband or evidence is contained.

*Acevedo*, 500 U.S. at 577, 579–80; *see also Ross*, 456 U.S. at 825 (explaining that

when the automobile exception applies, "it justifies the search of every part of the

vehicle and its contents that may conceal the object of the search"); *United States*

*v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) ("Officers may conduct a

warrantless search of an automobile, including containers within it, when they have

probable cause to believe that the vehicle contains contraband or evidence of criminal activity.").[16]

## CONCLUSION

For the foregoing reasons, Chan's Motion to Suppress, Dkt. No. 41, is DENIED.

IT IS SO ORDERED.

DATED: January 27, 2023 at Honolulu, Hawaiʻi.



Derrick K. Watson
Chief United States District Judge

---

*United States of America v. Christopher Chan*; Crim No. 22-00109 DKW;
**ORDER DENYING DEFENDANT CHRISTOPHER CHAN'S MOTION TO SUPPRESS EVIDENCE**

---

[16]The Court notes that police were likely *also* authorized to search Chan's vehicle pursuant to their "valid community caretaking purpose." *See United States v. Anderson*, 56 F.4th 748, 758 (9th Cir. 2022) (*per curiam*) (holding that an inventory search does not violate the Fourth Amendment where (i) a vehicle is impounded for a valid community caretaking purpose, (ii) inventory search before impoundment is standard practice, and (iii) the inventory search is conducted in good faith—*e.g.*, for community caretaking purposes and not solely to search for evidence of a crime). Here, Chan's vehicle was impounded because it was blocking traffic out of the Uraku Tower, and the Building Manager requested its removal. In this context, a subsequent towing and inventory search by HPD would likewise have discovered the firearm in the trunk, even if HPD had no prior knowledge of it. Therefore, the search was likely also permissible under this rule. *See Strieff*, 579 U.S. at 238 ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without [any] unconstitutional source.").