Salina M. Kanai #8096
Federal Public Defender for the District of Hawaii

Craig W. Jerome #8797
First Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii 96850-5269
Telephone:   (808) 541-2521
Facsimile:   (808) 541-3545
E-Mail:      craig_jerome@fd.org

Attorneys for Defendant
Christopher Chan

In the United States District Court for the District of Hawaii

| | |
|---|---|
| United States of America,<br>Plaintiff,<br><br>v.<br><br>Christopher Chan,<br>Defendant. | Cr. No. 1:22-cr-00109-DKW<br><br>Motion to Dismiss Under the Second Amendment or the Commerce Clause; Table of Authorities; Exhibit A; Certificate of Service |

## Motion to Dismiss Under the Second Amendment or the Commerce Clause

Defendant Christopher Chan, through counsel, moves for dismissal of this matter because this prosecution violates the Second Amendment to the United States Constitution. In the alternative, he contends that dismissal of Count 2 is appropriate on Commerce Clause grounds.

### I.   Both counts violate the Second Amendment.

The second superseding indictment contains two counts alleging that Chan's possession of a firearm violated various federal statutes. Count 1 alleges that his possession of a short-barreled rifle was illegal because it was not registered to him.

ECF 71, PageID.271 (accusing Chan of violating 26 U.S.C. §§5841, 5845(a)(3), 5861(d), and 5871). Count 2 alleges that Chan illegally possessed a machinegun—based on his possession of the same firearm predicating Count 1 together with a machinegun conversion device that was installed in it. ECF 71, PageID.271–272 (accusing Chan of violating 18 U.S.C. §§922(o) and 924(a)(2)). This Court should dismiss both counts because, as applied to each of them, they violate the Second Amendment to the United States Constitution.

The Second Amendment guarantees "the right of the people to keep and bear [a]rms." U.S. Const., amend. II. As the Supreme Court has repeatedly recognized, "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 144 S.Ct. 1889, 1897 (2024) (quoting *McDonald v. Chicago,* 561 U.S. 742, 778 (2010)). "[T]he right secures for Americans a means of self-defense." *Id.* "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald*, 561 U.S. at 780). To the contrary, the right is vital to the American concept of ordered liberty:

> As a leading and early proponent of emancipation observed, "Disarm a community, and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty."

*Rahimi,* 144 S.Ct. at 1897.

The Supreme Court's Second Amendment precedent instructs courts to "assess all Second Amendment challenges through the dual lenses of text and

history." *United States v. Duarte*, 101 F.4th 657, 661 (CA9 2024). "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. "If the Second Amendment's plain text protects the person, his arm, and his proposed course of conduct, it then becomes the Government's burden to prove that the challenged law is consistent with this Nation's historical tradition of firearm regulation." *Duarte*, 101 F.4th at 661–62. The question as to whether the Second Amendment's "bare text" covers "the person challenging the law, the 'arm' involved, and the person's 'proposed course of conduct,'" is a "threshold inquiry[.]" *Id.* at 665.

As to this case, the questions of whether the Second Amendment covers Chan and his proposed course of conduct are easily answered in the affirmative. Chan "is one of 'the people' because he is an American citizen." *Id.* at 671.  The Second Amendment applies to "all Americans, not an unspecified subset" of them, and the text and history of the amendment "confirms that the original public meaning of 'the people' in the Second Amendment included, at a minimum, all American citizens. *Id.* The Second Amendment also protects Chan's course of conduct, the simple possession of a firearm. *Id.* at 671. The act of possessing a firearm, be it at home or in public, counts as 'keeping' and 'bearing' under the Second Amendment's "plain language." *Id.* at 662; *Bruen*, 597 U.S. at 8–10; *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Thus, the only remaining aspect of *Bruen*'s threshold inquiry is whether short-barreled rifles (for Count 1) or machineguns (for Count 2) are "arms" that are covered by the Second Amendment's text.

3

"The 18th-century meaning" of the term arms "is no different from the meaning today." *Heller,* 554 U.S. at 581. But that does not mean that only those arms in existence in the 18th century are protected by the Second Amendment. *Id.* at 582. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (internal citations omitted). In *Heller,* the Supreme Court cited two 18th-century legal definitions that make clear the broad scope of the meaning of the term "arms." The first, "defined 'arms' as 'anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike, another.'" *Id.* at 581. And the other, although limiting "arms" to "instruments of offence *generally* made of use in war," nonetheless "stated that all firearms constituted 'arms.'" *Id.* at 581–82 (emphasis in original).

The Supreme Court has recognized "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" and has noted that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* at 29 (citing *Caetano v. Massachusetts,* 577 U.S. 411, 411–12 (2016) (per curiam)). A weapon cannot be banned simply because it was

not in common use at the time of the Second Amendment's enactment. *Caetano*, 577 U.S. at 411. Nor can it be banned simply because it is dangerous. Indeed, if that were the test, handguns would certainly fall outside the scope of the Second Amendment's protection of "arms." *Heller*, 554 U.S. at 711 (Stevens, J., dissenting) ("the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous"). "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring) (emphasis in original).

As Justice Alito explained in his concurrence in *Caetano*, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* at 418. "If *Heller* tells us anything, it is that firearms cannot be categorically prohibited because they are dangerous." *Id.* Neither courts nor legislatures are allowed to make utilitarian choices and decide what conduct or arms the Second Amendment *should* cover. The Supreme Court has "expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important government interests." *Bruen*, 587 U.S. at 27 (quoting *Heller*, 554 U.S. at 634; internal quotation marks omitted). The very point of enshrining individual rights within the Constitution is that doing so takes the issue of whether certain kinds of conduct should be regulated "out of the hands of government[.]" *Bruen*, 597 U.S. at 28. "[T]he pertinent Second Amendment inquiry is whether [a weapon is]

5

commonly used by law-abiding citizens for lawful purposes *today*." *Caetano*, 577 U.S. at 420 (Alito, J., concurring).

Both short-barreled rifles and machineguns meet that test. In concluding that tasers were not dangerous and unusual for Second Amendment purposes, Justice Alito noted that "hundreds of thousands of Tasers and stun guns have been sold to private citizens[.]" *Id.* The same is true of short-barreled rifles and machineguns. In 2021, the ATF reported that 532,725 short-barreled rifles were registered and lawfully possessed in the United States. ATF, *Firearms Commerce in the United States, Annual Statistical Update* (2021), 15-16, available at https://bit.ly/417OWmW (attached as Exhibit A). That same year, the ATF reported 741,146 lawfully registered and possessed machineguns. *Id.*

ATF rulemaking has added to those numbers. On January 31, 2023, the ATF issued a Final Rule amending the definition of "rifle" in the NFA to reclassify pistols equipped with stabilizing braces as short-barreled rifles. ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023). In promulgating the Final Rule, the ATF estimated that there were at least 3 million "stabilizing braces" and firearms with an attached "stabilizing brace" in circulation in the United States. *Id.* at 6560. The ATF now considers those weapons to be short-barreled rifles, which means that, as of 2023, millions of Americans possessed millions of short-barreled rifles for lawful purposes. How, then, can short-barreled rifles be dangerous and unusual weapons that are unprotected by the Second Amendment? The answer is, they cannot be.

6

We know, moreover, that as of 2018 there were an estimated 280,000 to 520,000 legal bump stock devices in circulation in the United States. *See* ATF, *Bump-Stock-Type Devices*, 83 Fed. Reg. 13442, 13451 (March 29, 2018). In 2018, the ATF repudiated its prior guidance that bump stocks did not qualify as machineguns, and it ordered bump stock owners to destroy them or surrender them to ATF within 90 days. *Garland v. Cargill*, 602 U.S. 406, 413 (2024). The Supreme Court recently held that these devices did not, in fact, fit within 26 U.S.C. §5845(b)'s definition of a "machinegun." *Id.* at 410, 423. Nonetheless, for the past six years the ATF viewed the devices as machineguns. And bump stocks enable semi-automatic firearms to fire at the same rate as machineguns. *Id.* at 455 (Sotomayor, J., dissenting). That hundreds of thousands of bump stocks were previously lawfully possessed in the United States—and now apparently can be lawfully possessed again in the wake of *Cargill*—simply lends further support to the obvious conclusion that machineguns (and machinegun-type devices) are commonly used by law-abiding citizens for lawful purposes today.

The preliminary issue is really that simple and straightforward. Short-barreled rifles are arms. Machineguns are arms. Therefore, they are protected by the Second Amendment. Neither dicta nor precedent that does not apply the correct legal standard can change the plain meaning of the Second Amendment.

In *United States v. Henry*, 688 F.3d 637 (CA9 2012), the Ninth Circuit held that machineguns are dangerous and unusual weapons to which the Second Amendment does not reply. *Henry*, 688 F.3d at 640. The Ninth Circuit did not,

7

however, apply the appropriate legal test in *Henry*—the test that the Supreme Court reaffirmed, and noted was still being misapplied, in *Rahimi*—and the Court should view *Henry* as overruled. *Duarte*, 101 F.4th at 664–665 (concluding that prior Ninth Circuit firearms precedent no longer controls where the precedent's reasoning is "clearly irreconcilable" with *Bruen*); *Miller v. Gammie*, 335 F.3d 889 (CA9 2003). In *Henry,* the Ninth Circuit applied the old interest-balancing approach that the Supreme Court has since firmly rejected and, thus, *Henry* is no longer binding on this Court. This Court, that is, must consider itself bound by *Rahimi* and *Bruen*, not *Henry. Miller*, 335 F.3d at 899–900 (when intervening authority is irreconcilable with prior circuit law, a district court must "consider [itself] bound by the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been effectively overruled").

The *Henry* court mistakenly placed great emphasis on the dangerousness of machineguns, but dedicated just two short sentences to analyzing why machineguns are "unusual." That analysis said little more than that machineguns have been banned since 1986, while ignoring that hundreds of thousands of machineguns were, nonetheless, still legally registered and possessed. *Henry* did not point to anything prior to 1986 to support any conclusion that banning machineguns is consistent with the history and tradition of the United States. *Henry* simply says that a ban on machineguns is constitutional because there's a law that bans them, and, as a result of that law, they are not that commonly owned. *Bruen* makes clear, however, that the existence of a firearm regulation can't be the source of its own

8

constitutional validity. *Henry*'s reasoning, shaky under *Heller* to begin with, completely falls apart under the weight of *Rahimi* and *Bruen*.

Much the same can be said of *Heller's* dicta discussion of *United States v. Miller*, 307 U.S. 174 (1939), in which the Supreme Court had remarked "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller,* 554 U.S. at 625. In *Heller*, the Supreme Court cabined *Miller*, noting that *Miller* "did not even purport to be a thorough examination of the Second Amendment." *Id.* at 623. And, thus, the *Miller* case "stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* Neither *Miller*, nor *Heller* for that matter, engaged in a thorough or reasoned discussion of exactly what types of weapons fell outside the scope of the Second Amendment's protection. The Court's conclusion in *Miller* that short-barreled shotguns were not protected, moreover, rested on reasoning that subsequent Supreme Court precedent has soundly rejected—that short-barreled shotguns had no military purpose. *Miller*, 307 U.S. at 178 ("In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.").

The Ninth Circuit recently rejected the argument that it should defer to *Heller*'s dicta regarding the "presumptive lawfulness" of felon firearm bans in

9

determining the scope of the Second Amendment. *Duarte*, 104 F.4th at 668-69. *Bruen*, the Ninth Circuit noted, "requires courts to assess whether . . . *any* regulation infringing on Second Amendment rights is consistent with this nation's historical tradition of firearm regulation." *Id.* at 668 (citations omitted, cleaned up). In this case, as in *Duarte*, simply repeating *Heller's* dicta about the presumptive unlawfulness of types of weapons "will no longer do after *Bruen.*" *Id.*

Every Second Amendment case must proceed by examining our nation's history of firearm regulation, which in challenges to a ban on a type of firearm, requires the court to determine whether the specific weapon at issue is both dangerous and unusual. *Bruen*, 597 U.S. at 21. As explained above, neither short-barreled rifles nor machineguns are dangerous *and* unusual under any proper application of the test. Thus, they are arms that are entitled to Second Amendment protection.

In response to this motion, therefore, the government "bears the burden to justify [the] regulation[s]" it claims, under both counts of the second superseding indictment, that Chan's act of firearm possession violated. *Rahimi*, 144 S.Ct. at 1897. That burden entails demonstrating that "the challenged regulation[s] [are] consistent with the principles that underpin our regulatory tradition" of firearms. *Rahimi*, 144 S.Ct. at 1898; *Bruen*, 597 U.S. at 24. True enough, the government need not produce a historical regulation from 1791, when the Second Amendment was adopted, that is an exact twin of those it claims Chan has violated; but, at a minimum, it must produce a historical regulatory tradition from the time of the

10

founding that is relevantly similar as to why and how the modern regulations burden the constitutional right to keep and bear arms. *Rahimi*, 144 S.Ct. at 1897–1898; *Bruen*, 597 U.S. at 26–31. As *Rahimi* puts it:

> In *Heller*, our inquiry into the scope of the right began with constitutional text and history. In *Bruen*, we directed courts to examine our historical tradition of firearm regulation to help delineate the contours of the right. We explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation.
>
> Nevertheless, some courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber. As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it extends, prima facie, to all instruments that constitute bearable arms, even those that were not yet in existence. By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.
>
> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances. Discerning and developing the law in this way is a commonplace task for any lawyer or judge.
>
> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the

11

principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin.

*Rahimi*, 144 S.Ct. at 1897–1898.

Justifying the regulation through history, as both *Rahimi* and *Bruen* emphasize, is a task that the government must shoulder; this Court, that is, is "not obliged to sift the historical materials for evidence to sustain" the statutes that the government accuses Chan of violating. *Bruen*, 597 U.S. at 60. And just to be perfectly clear, Chan's *Bruen* claim is an as-applied one. He contends nothing more than that *this* prosecution—based on his alleged possession of the firearm allegedly "found in a Toyota Camry automobile" on August 16, 2022—is unconstitutional. The Court must conclude that Counts 1 and 2 violate the Second Amendment unless "the government . . . affirmatively prove[s] that [the regulations they seek to enforce are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen,* 597 U.S. at 19.

The government will be unable to persuasively carry its burden to justify applying the regulatory statutes cited in the second superseding indictment to Chan, because neither registering rifles (as to Count 1) nor complete disarmament of any subset of firearms (as to Count 2) is consistent with our history of regulating firearms during the founding era. State-mandated firearm registration did not begin until 1911, with the passage of New York's Sullivan Law, and federal registration requirements did not begin until 1934, with the passage of the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934). Regulation of machineguns, moreover, did not begin at all until 1968, with the passage of the

12

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (1968), even though such firearms existed as early as 1884. *McClean v. Bradley*, 282 F. 1011, 1022 (N.D. Ohio 1922). Section 922(o), moreover, was not enacted until 1986. Firearm Owners' Protection Act §102, Pub. L. No. 99-308, 100 Stat. 449, 453 (1986). That is 195 years after the ratification of the Second Amendment and 118 years after the ratification of the Fourteenth Amendment.

An exhaustive survey of our history of firearm regulation—none of which suggests that the act of possession Chan is accused of committing can be prosecuted consistently with Second Amendment—is set out in *Duncan v. Bonta*, ___ F.Supp.3d ___, 2023 WL 6180472 at *20–36 (S.D. Cal. 2023) (temporary stay pending appeal issued in *Duncan v. Bonta*, 83 F.4th 803 (CA9 2023)). The burden is on the government to find a historical analogue, and Chan will respond to such analogies if they are presented. Under a proper reading of the Second Amendment, all analogies to which the government may point will fail.

This is not a case, like *Rahimi*, where the government seeks to keep all firearms out of the hands of a few, demonstrably dangerous people. Instead, it is a case, like *Bruen*, where it seeks to keep certain firearms out of the hands of all (or most) people. Section 922(o) is an explicit ban on the possession of all machineguns. And the NFA imposes onerous restrictions that infringe upon law-abiding individuals' Second Amendment rights to keep and bear short-barreled rifles. The NFA requires registration and taxation of such arms, despite the fact that they are commonly owned. Citizens who wish to exercise their right to possess such arms for

13

legitimate, protected purposes—including the key purpose of self-defense—are subjected to ongoing and oppressive compliance requirements, enhanced criminal penalties designed to discourage ownership and transactions in firearms, and a $200 tax. There is no historical and traditional framework that allows the government to infringe on a citizen's Second Amendment rights in this way.

The government cannot "impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). In today's dollars, the $200 tax on NFA firearms seems almost nominal. But the $200 amount of the tax was not random. Instead, the amount was set at $200 because that was the average price of a machinegun. National Firearms Act: *Hearings Before the H. Comm. on Ways & Means on HR 9066*, 73d Cong. 12 (1934) ("*NFA Hearings*"). Thus, the $200 amount was designed to function as a 100% tax on machinegun purchases. *See id.* There is simply no historical basis to uphold the government placing a 100% tax on the exercise of a constitutional right that it disfavors or seeks to discourage, whether it be the right to keep and bear arms, the right to the free exercise of religion, or any other right our founders saw fit to enshrine in the Bill of Rights.

The "tax" imposed under the NFA, moreover, was not intended to serve the traditional purposes of taxation. Instead, it was designed to function in much the same way as a constitutionally-problematic ban on the firearms that it targeted:

> While the NFA was enacted by Congress as an exercise of its authority to tax, the NFA had an underlying purpose unrelated to revenue collection. As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms. . .

14

> The $200 making and transfer taxes on most NFA firearms were
> considered quite severe and adequate to carry out Congress' purpose to
> discourage or eliminate transactions in these firearms.

ATF, *National Firearms Act Handbook*, Chapter 1, §1.1.1, at 1 (available at:

https://bit.ly/3LmXEIP. The $200 tax imposed in 1934 is the equivalent of nearly

$5000 in today's dollars when adjusted for inflation. U.S. Bureau of Labor

Statistics, *CPI Inflation Calculator*, available at: https://bit.ly/4d2Q1CU. During the

hearings on the NFA, the Attorney General, Homer Cummings, acknowledged the

constitutional problem that banning NFA weapons (including machineguns) would

create: "You see, if we made a statute absolutely forbidding any human being to

have a machine gun, you might say there is some constitutional question involved.

But when you say 'We will tax the machine gun' and when you say 'the absence of a

license showing payment of the tax has been made indicates that a crime has been

perpetrated,' you are easily within the law." *NFA Hearings*, at 19.

No court would countenance a regime under which the government required

users of a specific social media platform to pay the government $200, be placed on a

government database, submit fingerprints, and comply with numerous other

restrictions before being allowed to exercise their First Amendment rights by

accessing or posting on the service. That would be especially true if in enacting

those restrictions the government acknowledged that it was doing so in order to

discourage or prevent citizens from free expression using the platform. Nor would a

court uphold a requirement that those who wished to exercise their Fifth

Amendment rights had to comply with similar taxation and registration

requirements. The right to keep and bear arms cannot be treated as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (citation omitted). And Chan is, in practice, totally banned from possessing the firearm that the government categorizes as a short-barreled rifle in Count 1. Because that firearm is also a machine gun, the ATF will neither register it nor collect the tax on it. *See* 26 U.S.C. §5822 (applications to register a firearm under the NFA "shall be denied if the making or possession of the firearm would place the person making the firearm in violation of federal law"); 27 C.F.R. §479.105. There is no historical analogue for such a total ban. Under the "fairly straightforward" methodology "centered on constitutional text and history" that *Bruen* demands, both Count 1 and Count 2 of the second superseding indictment violate the Second Amendment as applied to the facts of this case.

*Rahimi* does nothing to undermine this conclusion. In fact, the case makes that conclusion even more clear. *Rahimi* stands for a relatively simple and straightforward proposition: "When an *individual* poses a clear threat of physical violence to another, *the threatening individual* may be disarmed." *Rahimi*, 144 S.Ct. at 1901 (emphases added). "Unlike the regulation struck down in *Bruen*," the Supreme Court noted, the challenged regulation in *Rahimi* "does not broadly restrict arms use by the public generally." *Id.* And the law upheld in *Rahimi* has other crucial limiting factors. First, the disarmament can take place only after a court has found that the specific person to be disarmed "represents a credible threat to the physical safety of another." *Id.* at 1901–1902 (citing 18 U.S.C. §922(g)(8)).

16

Second, the disarmament is temporary as applied to the disarmed individual, because it only prohibits firearm possession so long as the person is subject to the court order that made the credible threat determination. *Id.*

As the Supreme Court emphasized in *Rahimi*, "our Nation's tradition of firearm regulation distinguishes citizens who have been found [by a court] to pose a credible threat to the physical safety of other from those who have not." *Id.* at 1902. The regulations challenged in this case, however, do no such thing. Instead, they infringe upon the Second Amendment rights of all American citizens in a way that cannot be squared with our country's history and traditions. The "broad prohibitory regime" engendered by the regulations in this case cannot be upheld by applying the reasoning under which the Supreme Court upheld the "narrow one" in *Rahimi*. *Id.* To the contrary, the opposite is true. The Supreme Court's reasoning in *Rahimi* illustrates why the regulations in this case violate the Second Amendment—they are too broad, too prohibitory, and too permanent, and they do nothing to distinguish between citizens who pose a credible threat of danger from those who do not, nor demand that such a finding be made by a judge.

Because Counts 1 and 2 violate the Second Amendment, this Court must dismiss them.

## II.   Count 2 violates the Commerce Clause.

Under the "Commerce Clause," Congress has the power to "regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const., art. I, §8, cl. 3. "It is well-established that Congress can

regulate three categories of economic activity under its commerce power: (1) 'the use of the channels of interstate commerce,' (2) 'the instrumentalities of interstate commerce' and (3) 'those activities having a substantial relation to interstate commerce.'" *United States v. Stewart*, 451 F.3d 1071, 1073 (CA9 2006) (*Stewart II*) (quoting *United States v. Lopez*, 514 U.S. 549, 558–59 (1995)). Congress purportedly enacted §922(o) pursuant to its authority to regulate interstate commerce under the Commerce Clause. *Id.* at 1073. Section 922(o), however, does not contain an express interstate commerce element. *United States v. Stewart*, 348 F.3d 1132 (CA9 2003) (*Stewart I*), *vacated*, 545 U.S. 1112 (2005), *overruled by Stewart II*. "Notably absent" from §922(o) "is any jurisdictional requirement that the machinegun has traveled in or substantially affected interstate commerce." *Stewart I*, 348 F.3d at 1134.

In *Stewart I*, the Ninth Circuit considered whether §922(o), as applied to a defendant who possessed homemade machineguns, offends the Commerce Clause. *Id.* While noting that parts of the machineguns moved in interstate commerce, the Ninth Circuit reasoned that, "[a]t some level, of course, everything we own is composed of something that once traveled in commerce. This cannot mean that *everything* is subject to federal regulation under the Commerce Clause, else that constitutional limitation would be entirely meaningless." *Id.* at 1135. In *Stewart I,* the Ninth Circuit applied the Supreme Court's four-part test from *United States v. Morrison*, 529 U.S. 598, 610–12 (2000), and concluded that, because §922(o) could not "be viewed as having a substantial effect on interstate commerce[,]" it was

18

unconstitutional as applied to the simple possession of homemade machineguns.[1] *Id.* at 1136–40.

A short time after *Stewart I* was decided, however, the Supreme Court granted a petition for writ of certiorari and remanded the case to the Ninth Circuit for further consideration in light of the Supreme Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005) (holding that Congress had the power under the Commerce Clause to regulate the intrastate possession of marijuana authorized by a physician's prescription dispensed in accordance with state law). On remand, the Ninth Circuit concluded that, applying *Raich*'s reasoning, "Congress had a rational basis for concluding that in the aggregate, possession of homemade machineguns could substantially affect interstate commerce in machineguns. Homemade guns, even those with a unique design, can enter the interstate market and affect supply and demand." *Stewart II*, 451 F.3d at 1078. Thus, according to the Ninth Circuit, section 922(o) was a valid exercise of Congress's powers under the Commerce Clause. *Id.*

The Supreme Court's holding in *Raich* was underpinned by its conclusion that the activities regulated by the Controlled Substances Act "are quintessentially

---

[1] That four-factor test required a court to consider: "(1) whether the regulated activity is commercial or economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated." *Stewart I*, 348 F.3d at 1136–37 (citing *Morrison*, 529 U.S. at 610–12).

economic[,]" because the CSA "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Raich*, 545 U.S. at 26. Far from being "quintessentially economic," the simple possession of a firearm, even an automatic firearm, is the type of noneconomic, private conduct that the Commerce Clause cannot reasonably reach. It is not only noneconomic, private conduct, it is also constitutionally protected conduct, unlike the possession of marijuana (or any other drug) which lacks the constitutional protection of the Second Amendment or any other constitutional provision. Thus, *Stewart II* was wrongly decided, because the *Raich* analysis does not map jot-for-jot onto the constitutionally protected right to possess a firearm. On this point, Chan agrees with Justice Thomas that the line of caselaw flowing from *Scarborough v. United States*, 431 U.S. 563 (1977), through *United States v. Howald*, 104 F.4th 732, 737–738 (CA9 2024) (reaffirming that the Ninth Circuit reads "*Scarborough* to have implicitly assumed the constitutionality of [any statute containing an] 'in commerce' requirement" and reindorsing "its continuing vitality" as having "been left intact by *Lopez*" (citations and quotation marks omitted)), is of doubtful validity under proper historical approach grounded on first principles rather than implicit assumptions. *Rahimi*, 602 U.S. at ___, 2024 WL 3074728 at *42, n.6 (Thomas, J., dissenting).

Nonetheless, Chan recognizes that this Court is likely bound by *Stewart II's* holding. *Henry*, 688 F.3d at 642 (holding that, even after *Heller*, *Stewart II's*

20

Commerce Clause holding remains binding precedent in the Ninth Circuit). He raises the Commerce Clause issue here to preserve it for further appellate review.

### III.   Conclusion.

In accord with the foregoing, and any further litigation on this motion, this Court should dismiss this matter, because prosecuting Chan for allegedly possessing a firearm in violation of the statutes cited in the second superseding indictment is not consistent with the Second Amendment, and because Congress lacks the power under the Commerce Clause to regulate his possession of a machinegun absent some interstate jurisdictional element.

Honolulu, Hawaii, July 15, 2024.

> _/s/ Craig W. Jerome_
> Craig W. Jerome
> First Assistant Federal Defender
> Attorney for Defendant
> Christopher Chan

## Table of Authorities

**Cases**

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam). .......................... 4, 5, 6

*District of Columbia v. Heller*, 554 U.S. 570 (2008). ................... 3, 4, 5, 9, 10, 11, 20

*Duncan v. Bonta*, ___ F.Supp.3d ___, 2023 WL 6180472 (S.D. Cal. 2023). ............ 13

*Duncan v. Bonta*, 83 F.4th 803 (CA9 2023) (stay order). ........................................ 13

*Garland v. Cargill*, 602 U.S. 406 (2024). ...................................................................... 7

*Gonzales v. Raich*, 545 U.S. 1 (2005). ................................................................. 19, 20

*McClean v. Bradley*, 282 F. 1011 (N.D. Ohio 1922). ................................................. 13

*McDonald v. Chicago*, 561 U.S. 742 (2010). ................................................................. 2

*Miller v. Gammie*, 335 F.3d 889 (CA9 2003). .............................................................. 8

*Murdock v. Pennsylvania*, 319 U.S. 105 (1943). ....................................................... 14

*N.Y. State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022). ....................... 2, passim

*Scarborough v. United States*, 431 U.S. 563 (1977). ................................................. 20

*United States v. Duarte*, 101 F.4th 657 (CA9 2024). ....................................... 3, 8, 10

*United States v. Henry*, 688 F.3d 637 (CA9 2012). .................................... 7, 8, 9, 20

*United States v. Howald*, 104 F.4th 732 (CA9 2024). ............................................... 20

*United States v. Lopez*, 514 U.S. 549 (1995). ..................................................... 18, 20

*United States v. Miller*, 307 U.S. 174 (1939). ............................................................. 9

*United States v. Morrison*, 529 U.S. 598 (2000). ................................................. 18, 19

*United States v. Rahimi*, 144 S.Ct. 1889 (2024). .......................................... 2, passim

*United States v. Stewart*, 348 F.3d 1132 (CA9 2003) (*Stewart I*). .................. 18, 19

*United States v. Stewart*, 451 F.3d 1071 (CA9 2006) (*Stewart II*). ............. 18, 19, 20

**Constitution**

U.S. Const., art. I, §8, cl. 3 (Commerce Clause). ........................................... 1, 17–21

U.S. Const., amend. II (1791). ...................................................................... 1, passim

**Statutes**

18 U.S.C. §922 (June 25, 2022). ..................................................... 2, 13, 16, 18, 19

18 U.S.C. §924 (June 25, 2022). .................................................................................. 2

26 U.S.C. §5822. ........................................................................................................ 16

26 U.S.C. §5841 (Oct. 4, 1976). .................................................................................. 2

26 U.S.C. §5845 (Feb. 1, 2019). .............................................................................. 2, 7

26 U.S.C. §5861 (Oct. 22, 1968). ............................................................................... 2

26 U.S.C. §5871 (Oct. 12, 1984). ............................................................................... 2

National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934). .... 6, 12–16

Omnibus Crime Control and Safe Streets Act of 1968,
        Pub. L. No. 90-351, 82 Stat. 197 (1968). ..................................................... 13

**Regulation**

27 C.F.R. §479.105. ................................................................................ 16

**Other Authority**

ATF, *Bump-Stock-Type Devices*, 83 Fed. Reg. 13442 (March 29, 2018). ................. 7

ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
     88 Fed. Reg. 6478 (Jan. 31, 2023). ................................................ 6

ATF, *Firearms Commerce in the United States,*
     *Annual Statistical Update* (2021). .................................................. 6

ATF, *National Firearms Act Handbook.* ...................................................... 15

National Firearms Act: *Hearings Before the H. Comm. on Ways & Means*
     *on HR 9066*, 73d Cong. 12 (1934). ......................................... 14, 15

U.S. Bureau of Labor Statistics, *CPI Inflation Calculator.* .................................... 15

# EXHIBIT A

## Exhibit 8: National Firearms Act Registered Weapons by State (May 2021)

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|
| Alabama | 1,352 | 82,978 | 34,702 | 64,506 | 8,830 | 2,552 | 194,920 |
| Alaska | 345 | 6,256 | 1,802 | 15,192 | 3,108 | 1,534 | 28,237 |
| Arkansas | 703 | 83,161 | 5,689 | 38,058 | 5,076 | 1,294 | 133,981 |
| Arizona | 2,647 | 123,286 | 19,032 | 85,353 | 25,203 | 3,170 | 258,691 |
| California | 4,752 | 324,948 | 29,112 | 17,271 | 15,520 | 14,757 | 406,360 |
| Colorado | 1,154 | 57,926 | 7,666 | 67,008 | 13,509 | 2,119 | 149,382 |
| Connecticut | 1,034 | 14,610 | 35,235 | 18,648 | 4,212 | 1,135 | 74,874 |
| District of Columbia | 69 | 62,757 | 7,872 | 1,024 | 1,426 | 1,167 | 74,315 |
| Delaware | 52 | 3,876 | 537 | 411 | 565 | 651 | 6,092 |
| Florida | 4,100 | 230,917 | 47,117 | 175,156 | 50,848 | 10,587 | 518,725 |
| Georgia | 2,269 | 96,486 | 42,545 | 129,566 | 21,232 | 12,026 | 304,124 |
| Hawaii | 34 | 8,234 | 441 | 403 | 93 | 75 | 9,280 |
| Iowa | 919 | 19,353 | 7,228 | 22,529 | 2,937 | 1,212 | 54,178 |
| Idaho | 667 | 23,674 | 5,299 | 40,755 | 5,376 | 654 | 76,425 |
| Illinois | 1,075 | 103,440 | 30,576 | 3,297 | 4,622 | 1,739 | 144,749 |
| Indiana | 1,862 | 50,885 | 21,137 | 63,249 | 10,872 | 9,541 | 157,546 |
| Kansas | 823 | 26,035 | 3,986 | 31,811 | 5,924 | 1,271 | 69,850 |
| Kentucky | 1,212 | 36,615 | 18,128 | 44,040 | 6,717 | 2,121 | 108,833 |
| Louisiana | 713 | 60,863 | 7,206 | 72,042 | 9,212 | 2,025 | 152,061 |
| Massachusetts | 969 | 19,571 | 7,070 | 10,409 | 6,079 | 1,040 | 45,138 |
| Maryland | 1,137 | 61,460 | 29,854 | 32,275 | 7,633 | 3,898 | 136,257 |
| Maine | 600 | 3,789 | 5,109 | 8,285 | 3,057 | 556 | 21,396 |
| Michigan | 1,284 | 30,928 | 17,464 | 49,324 | 9,120 | 1,715 | 109,835 |
| Minnesota | 2,825 | 61,232 | 8,779 | 48,154 | 7,681 | 1,154 | 129,825 |
| Missouri | 1,574 | 37,631 | 11,167 | 49,754 | 10,230 | 2,995 | 113,351 |
| Mississippi | 564 | 32,211 | 4,906 | 36,545 | 5,354 | 1,132 | 80,712 |
| Montana | 467 | 4,999 | 2,531 | 25,409 | 2,612 | 660 | 36,678 |

**Exhibit A**

## Exhibit 8: National Firearms Act Registered Weapons by State
## (May 2021) — continued

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|
| North Carolina | 1,158 | 107,333 | 15,875 | 76,759 | 17,478 | 3,563 | 222,166 |
| North Dakota | 215 | 3,726 | 1,670 | 23,042 | 2,003 | 319 | 30,975 |
| Nebraska | 816 | 9,780 | 2,403 | 25,879 | 3,472 | 911 | 43,261 |
| New Hampshire | 534 | 5,834 | 20,817 | 36,954 | 7,613 | 681 | 72,433 |
| New Jersey | 534 | 47,080 | 44,422 | 3,889 | 3,775 | 2,528 | 102,228 |
| New Mexico | 404 | 93,029 | 4,233 | 19,873 | 4,590 | 839 | 122,968 |
| Nevada | 1,264 | 50,124 | 14,577 | 37,880 | 12,662 | 2,500 | 119,007 |
| New York | 1,848 | 54,148 | 13,554 | 7,406 | 7,622 | 7,613 | 92,191 |
| Ohio | 2,312 | 92,909 | 22,979 | 68,736 | 15,158 | 6,567 | 208,661 |
| Oklahoma | 1,253 | 19,174 | 9,776 | 62,404 | 8,738 | 2,023 | 103,368 |
| Oregon | 1,683 | 28,654 | 6,740 | 49,197 | 9,483 | 1,717 | 97,474 |
| Pennsylvania | 2,482 | 205,854 | 21,169 | 83,563 | 21,215 | 13,884 | 348,167 |
| Rhode Island | 46 | 3,663 | 630 | 96 | 338 | 114 | 4,887 |
| South Carolina | 733 | 44,017 | 10,997 | 50,422 | 9,088 | 3,948 | 119,205 |
| South Dakota | 388 | 4,559 | 2,176 | 55,666 | 1,612 | 265 | 64,666 |
| Tennessee | 1,803 | 54,554 | 14,683 | 60,573 | 13,350 | 6,573 | 151,536 |
| Texas | 7,517 | 332,208 | 46,318 | 529,150 | 81,000 | 10,362 | 1,006,555 |
| Utah | 578 | 19,648 | 7,745 | 79,557 | 9,212 | 1,668 | 118,408 |
| Virginia | 3,094 | 250,986 | 43,877 | 90,454 | 26,361 | 8,935 | 423,707 |
| Vermont | 238 | 3,106 | 1,465 | 3,528 | 904 | 210 | 9,451 |
| Washington | 1,981 | 62,633 | 4,673 | 78,279 | 16,919 | 1,049 | 165,534 |
| Wisconsin | 853 | 36,053 | 8,391 | 40,596 | 8,070 | 1,467 | 95,430 |
| West Virginia | 465 | 25,315 | 7,359 | 13,696 | 2,913 | 1,215 | 50,963 |
| Wyoming | 337 | 120,688 | 2,019 | 16,681 | 2,089 | 433 | 142,247 |
| Other US Territories | 6 | 323 | 408 | 20 | 12 | 103 | 872 |
| **Total** | **67,744** | **3,343,519** | **741,146** | **2,664,774** | **532,725** | **162,267** | **7,512,175** |

## Certificate of Service

The undersigned certifies that a true and correct copy of the foregoing was served on the following by NEF when the foregoing was electronically filed in this Court on the date noted below:

Sara D. Ayabe
Rebecca A. Perlmutter
Assistant United States Attorneys

Honolulu, Hawaii, July 15, 2024.

*/s/ Craig W. Jerome*
Craig W. Jerome
First Assistant Federal Defender
Attorney for Defendant
Christopher Chan