Salina M. Kanai #8096
Federal Public Defender for the District of Hawaii

Craig W. Jerome #8797
First Assistant Federal Defender
Jacquelyn T. Esser #9226
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii 96850-5269
Telephone:   (808) 541-2521
Facsimile:   (808) 541-3545
E-Mail:      craig_jerome@fd.org
             jacquelyn_esser@fd.org

Attorneys for Defendant
Christopher Chan

In the United States District Court for the District of Hawaii

| | |
|---|---|
| United States of America,<br>　　　　　Plaintiff,<br><br>　　v.<br><br>Christopher Chan,<br>　　　　　Defendant. | Cr. No. 1:22-cr-00109-DKW<br><br>Reply to the Government's Response (ECF 147) to Chan's Motion to Dismiss Under the Second Amendment or the Commerce Clause (ECF 146); Table of Authorities; Certificate of Service |

**Reply to the Government's Response (ECF 147)
to Chan's Motion to Dismiss under
the Second Amendment or the Commerce Clause (ECF 146)**

Defendant Christopher Chan, through counsel, herein replies to the *United States' Response to Defendant's Motion to Dismiss under the Second Amendment or the Commerce Clause (ECF No. 146).* ECF 147.

1.      Chan's motion anticipates, rebuts, and adequately preserves his take on the unpersuasive arguments raised in the government's response. He, accordingly, does not repeat what has already been said in his motion as to the

common and lawful use of short-barreled rifles and machineguns, whether such weapons are outside the ambit of "arms" under the Second Amendment because they can properly be characterized as dangerous and unusual, and whether the charged conduct triggers the Second Amendment. Some things, however, bear additional comment and are addressed in this reply.

2. The government attempts to shift the burden under *Bruen* to Chan to demonstrate that the charged firearm—when variably characterized as either a short-barreled rifle or a machinegun—is in common use and, therefore, enjoys Second Amendment protection. ECF 147 at PageID 721 ("Chan must demonstrate that short-barreled rifles are 'in common use today for self-defense[.]'" (partially quoting *United States v. Alaniz*, 69 F.4th 1124, 1128 (CA9 2023))); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In making this assertion, the government reads *Alaniz* far too broadly.

Though the burden is clear at step two, when *Alaniz* describes the inquiry at step one of a *Bruen* analysis, it makes no mention of who bears the burden at that step. *Alaniz,* 69 F.4th at 1128. More importantly, however, the government ignores that the Supreme Court has made clear that the burden of proving that an arm is not in common usage, and that the arm therefore falls outside the ambit of Second Amendment protection, is on the government, not the defendant: "[T]he reach of the Second Amendment is not limited to only those arms that were in existence at the founding. Rather, it extends, prima facie, to all instruments that constitute bearable arms, even those that were not yet in existence" when the Second Amendment was

adopted. *United States v. Rahimi*, 144 S.Ct. 1889, 1897–1898 (2024) (as here, quotations in this reply are often silently cleaned up to remove internal citations and other distractions).

In other words, the government bears the burden of proving that short-barreled rifles and machineguns are "dangerous and unusual" as part of the second prong of the *Bruen* analysis. *See Teter v. Lopez*, 76 F.4th 938, 950 (CA9 2023), *vacated and reh'g en banc granted*, 93 F.4th 1150 (CA9 2024). ("[W]hether [a weapon is] 'dangerous and unusual' is a contention as to which [the government] bears the burden of proof in the second prong of the *Bruen* analysis.")[1] "Dangerous and unusual" is not something that the defendant must disprove at *Bruen's* first prong. Nor, for that matter, is proving a firearm is in "common use." As the government itself explains, showing that a firearm is not in common use is the same thing as showing it is dangerous and unusual. *See* ECF 147, PageID.725 n.9 (noting that a firearm is usual and not in common use "for the same reasons"). A defendant, accordingly, is not required to demonstrate a firearm is in common use at *Bruen's* first prong. Instead, a showing that a firearm is not in common use is properly couched under a discussion of whether a firearm is dangerous and unusual at *Bruen's* second prong, as to which the government carries the burden.

The first prong of the *Bruen* analysis centers on the plain text of the Second Amendment and, "when the Second Amendment's plain text covers an individual's

---

[1] Though *Teter* is no longer binding on the Court, its analysis and reasoning of the *Bruen* framework is highly informative and persuasive.

conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. When considering the Second Amendment's plain text, the Court in *Heller* noted that "arms" includes "weapons of offence, or armour of defence[,]" "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and noted that, according to founding-era sources, "all firearms constituted 'arms.'" *District of Columbia v. Heller*, 554 U.S. 570, 581-82 (2008). Thus, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. It is true that *Heller* concluded that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," but it never grounded this limitation in the Amendment's text. *See id.* at 623, 626. Nor did *Heller* foist a burden on the accused to affirmatively prove that a weapon was possessed, or otherwise borne, under such narrow circumstances.

That a bearable arm is "dangerous and unusual" does not mean it is not an "arm" as that term is used in the plain text of the Second Amendment. *Teter*, 76 F.4th at 949. "*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.'" *Id.* at 949-50 (quoting *Heller*, 554 U.S. at 627) (emphasis in *Teter*). "It did not say that dangerous and unusual weapons are not *arms*." *Id.* at 950 (emphasis in original). Thus, whether short-barreled rifles or machineguns are "dangerous and unusual" is a contention as to which the

4

government bears the burden of proof in the second prong of the *Bruen* analysis. *See id.*; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (CA2 2015) ("*Heller* emphasizes that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting."); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (CA7 2011) ("[I]f the government can establish that a challenged law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 685-86 (CA6 2016) ("If the government establishes that the challenged law regulates activity outside the scope of the Second Amendment as understood at the time of the framing of the Bill of Rights, the activity is unprotected and the law is not subjected to further constitutional scrutiny.").

The government has failed to meet this burden with regard to both short-barreled rifles and machineguns, and the Court must, therefore, grant Chan's motion to dismiss.

3.     The government has not shown that the firearm at issue here is dangerous and unusual, nor that it is of a type not commonly used. The government makes no attempt to unpack what constitutes "common use" or to otherwise provide any meaningful context for what the phrase "in common use" encompasses. Instead,

the government rests its argument on the unhelpful notion that the lawful registration and possession of 532,725 (in the case of short-barrel rifles) or 741,146 (in the case of machineguns) of a particular arm isn't common enough for that arm to enjoy constitutional protection. *See* ECF 147, PageID.719. The government reaches this dubious conclusion by comparing the number of registered short-barreled rifles and machineguns to an estimate of the total number of all firearms reportedly possessed, but not generally registered, in the United States. There is, however, nothing that is particularly helpful or illuminating in this comparison.

It should come as no surprise that people in the United States own far more non-NFA firearms than NFA firearms. The NFA imposes significant obstacles on manufacturing, selling, and possessing NFA firearms, including short-barreled rifles and machineguns. Indeed, the NFA's explicit underlying purpose was "to discourage or eliminate transactions in these firearms." ATF, *National Firearms Handbook,* Chapter 1, §1.1.1, at 1. And every machinegun that was not lawfully possessed before 1986 is entirely banned nationally. 18 U.S.C. §922(o). Falling afoul of the NFA's regulations, moreover, is a felony offense that will likely lead to a lengthy term of imprisonment and a lifetime ban on possessing any firearm.

Of course non-regulated firearms are far more common than regulated firearms. The NFA has made significant strides towards achieving its goal of eliminating the firearms on which it fixed its sights. The only surprising thing is that hundreds of thousands of these arms continue to be owned by law-abiding Americans for constitutionally protected purposes in spite of the burdensome

6

regulations imposed by the NFA. It is remarkable that the NFA has not infringed these arms out of existence through its onerous regulations. In making its argument, moreover, the government ignores or attempts to explain away the millions of stabilizing braces (now classified by the ATF as short-barreled rifles) and hundreds of thousands of bump stocks (until *Garland v. Cargill*, 602 U.S. 406 (2024), classified by the ATF as machineguns) owned by law-abiding Americans. *See* ECF 146 at PageID.683-84. The government should not be allowed to point to artificially suppressed percentages to justify the unconstitutional infringements that caused the artificial suppression in the first place. Who knows how many of these arms would be used and possessed by law-abiding citizens for lawful purposes if not for the impediments set in place by the NFA? As our national experience with bump stocks and pistol braces shows, the number would likely be in the millions. The numbers, even though driven down by the strictures of the NFA, nonetheless prove that these arms are in common use today.

While offering no helpful framework for the Court to properly analyze the issue, the government nonetheless urges the Court to reject the framework suggested by Justice Alito and Justice Thomas in Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016). ECF 147 at PageID.721 n.5. The government offers no explanation as to why the reasoning in Justice Alito's concurrence was flawed, instead it simply points out that "concurring opinions are not holdings of the Supreme Court." *Id.* But nobody ever said that they were. The

Court should adopt the "dangerous and unusual" analysis laid out in *Caetano*'s

concurrence because it is logical, coherent, and correct. Not because it is binding.

    4.    The government incorrectly asserts that Chan's conduct of seeking to

possess a short-barreled rifle is not protected by the Second Amendment. ECF 147

at PageID.722. It urges the Court to come to this conclusion by mischaracterizing

Chan's proposed course of conduct as "possession of an *unregistered* short-barreled

rifle." *Id.* But Chan's proposed course of conduct is nothing more than the

possession of a short-barreled rifle, and the inquiry for Second Amendment

purposes is whether the registration requirement (as well as the other onerous

requirements) that the NFA places upon that course of conduct can be justified

because those regulations are consistent with this Nation's historical tradition of

firearm regulation. *See Bruen*, 597 US at 17. It would be nonsensical to conclude, as

the government seems to imply, that the existence of a regulation can make the

possession of an arm fall outside of the Second Amendment protection simply

because the act of possession violates the regulation. Chan's alleged course of

conduct is the possession of the arm, and he asserts that the government cannot

constitutionally infringe on his right to do so by forcing him to abide by the

registration and taxation requirements of the NFA and then, should he fail to do

that, convict and punish him as a felon and impose a lifetime ban on him that

prevents him from ever possessing any kind of firearm again.

    5.    Contrary to the government's assertions, moreover, the NFA's

registration and taxation requirements do not fit within this Nation's well-

established historical traditions related to firearms regulations. Perhaps the most comprehensive explanation and analysis of why this is so comes from then-Circuit-Judge (now Justice) Kavanaugh's dissenting opinion in *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (CA DC 2011) (*Heller II*).[2] A primary issue in *Heller II* was whether a District of Columbia regulation requiring that that all guns be registered ran afoul of the Second Amendment. In concluding that it did, Justice Kavanaugh explained that "the fundamental problem with D.C.'s gun registration requirement is that registration of lawfully possessed guns is not 'longstanding.' Registration of all guns lawfully possessed by citizens in the relevant jurisdiction has not been traditionally required in the United States, and indeed, remains highly unusual today." *Id.* at 1291.

Justice Kavanaugh then drew a reasoned distinction between firearms licensing requirements and laws requiring the registration of guns:

---

[2] In *Heller II*, the D.C. Circuit analyzed the constitutionality, under the Second Amendment, of firearms registration requirements, regulations prohibiting the registration of "assault weapons," and a ban on the possession of large capacity magazines that the District of Columbia adopted in response to the Supreme Court's decision in *Heller*. *Heller II*, 670 F.3d at 1247. The *Heller II* majority upheld most of the regulations by applying the two-step history/means-end test that the Supreme Court later rejected in *Bruen*. *Id.* at 1248, 1253. Thus, the majority's opinion rested on an improper application of the law. Then-Judge, now Justice, Kavanaugh, however, dissented, reasoning that "courts are to assess gun bans and regulations based on text, history, and tradition, not by balancing tests such as strict or intermediate scrutiny[,]" and concluded that the District's ban on semi-automatic rifles and its gun registration requirement were both unconstitutional under *Heller*. *Id.* at 1269, 1271-72. Because Justice Kavanaugh applied the analysis that the Supreme Court later approved in *Bruen*, his dissenting opinion should carry far more precedential and persuasive weight than the majority's flawed analysis.

9

Licensing requirements mandate that gun owners meet certain standards or pass certain tests before owning guns or using them in particular ways. Those laws can advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public. For example, many jurisdictions that permit the carrying of concealed weapons have traditionally imposed licensing requirements on persons who wish to carry such weapons. Registration requirements, by contrast, require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can. For that reason, registration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership. It is true that registration requirements also provide a hook to convict (and potentially flip) criminals who are suspected of having committed other illegal acts, but as the majority opinion recognizes, that is a "circular" and constitutionally unacceptable rationale for requiring registration with respect to a core enumerated constitutional right.

*Id.*

This constitutionally unacceptable hook, convict, and (potentially) flip rationale for registration requirements was the primary rationale underlying the NFA's unconstitutional registration requirements. As Attorney General Homer Cummings explained when advocating for the adoption of the NFA, "I do not expect criminals to comply with this law; I do not expect the underworld to be going around giving their fingerprints and getting permits to carry these weapons, but I want to be in a position . . . to convict [them] because [they] have not complied." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means,* 73d Cong. 22 (1934).

As he examined the propriety of the restrictions at issue in *Heller II,* Justice Kavanaugh further distinguished registration requirements imposed on gun owners from record-keeping requirements on gun sellers. He explained that "[s]ome record

10

keeping requirements on gun sellers are traditional and common." *Heller II*, 670 F.3d at 1292. But "there is not, and never has been, a comprehensive federal system of firearm registration. Similarly, the vast majority of states have not traditionally required registration of lawfully possessed guns." *Id.* "There certainly is no tradition in the United States of gun registration imposed on all guns." *Id.*

Significantly, Justice Kavanaugh also explained why the existence of founding era "muster" and militia requirements, which the government unpersuasively cites to justify the NFA's regulations in this case, do not establish that modern firearm registration requirements fit within this Nation's well-established historical traditions related to firearms regulations:

> D.C. contends that registration is a longstanding requirement in American law because early militia laws required militiamen to submit arms for inspection. But D.C.'s attempt to analogize its registration law to early militia laws is seriously flawed for two reasons. First, those early militia laws applied only to militiamen, not to all citizens. In general, men over age 45 and women did not have to comply with such laws. Second, militia members were required to submit for inspection only one or a few firearms, not all of their firearms. That's because the purpose of those early militia requirements was not registration of firearms, but rather simply to ensure that the militia was well-equipped.

*Id.* at 1293 (internal citations omitted).

Finally, Justice Kavanaugh reasoned that *Miller* itself led to the conclusion that the government could not impose registration requirements unless the weapons to be registered pursuant to the regulations were themselves "dangerous and unusual" in the first place:

> The Supreme Court's 1939 decision in *Miller* further suggests that registration of all lawfully possessed guns is not permissible under the

11

Second Amendment. *Miller* involved a defendant's conviction for possessing an unregistered firearm. If registration were constitutionally permissible for all lawfully possessed guns, the Court could simply have affirmed the conviction on that ground. Instead, the *Miller* Court analyzed whether the kind of gun Miller possessed—a sawed-off shotgun—was within the class of weapons protected by the Second Amendment. The Court's approach suggested that the government could require registration only of guns that were outside the protection of the Second Amendment—namely, those classes of guns that the government had traditionally banned and that were not in common use, such as machine guns and sawed-off shotguns. After all, if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment.

*Id.* at 1293-94 (discussing *United States v. Miller*, 307 U.S. 174 (1939)).

Thus, if short-barreled rifles and/or machineguns are not "dangerous and unusual," then the NFA's registration and taxation requirements cannot be constitutionally justified on the basis that registration and taxation requirements are part of this Nation's history and tradition of firearms regulations. The government can, at most, impose a comprehensive registration requirement only on those weapons that are dangerous and unusual. It certainly cannot entirely ban an arm unless that arm is both dangerous and unusual, and even then, the historical analogues did not preclude the person from possessing *other* firearms; the analogues simply forfeited *that* firearm. *See Rahimi*, 144 S.Ct. at 1901. Such analogues also necessitated an additional element—such as wielding the firearm in a fashion that the public found threatening—beyond mere possession of an unusually dangerous weapon. *See id.* "Dangerous and unusual," therefore, is not

12

just the threshold inquiry in this case; it is the only relevant inquiry because the government cannot surmount its hurdle.

6.     In the context of firearms, moreover, what the "dangerous and unusual" test really boils down to is whether the firearm is unusual. All firearms are dangerous, and no firearms have proven to be more dangerous than handguns—the very arms that *Bruen* held could not be constitutionally banned no matter how strong an interest a jurisdiction had in doing so. Handguns "are the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. "But handguns are also the most popular weapon chosen by perpetrators of violent crimes. In 2018, 64.4% of firearm homicides and 91.8% of nonfatal firearm assaults were committed with a handgun. Handguns are also the most commonly stolen type of firearm—63% of burglaries resulting in gun theft between 2005 and 2010 involved the theft of at least one handgun." *Bruen*, 597 U.S. at 89 (Breyer, J., dissenting). Handguns are far and away the most popular tool for both homeowners and criminals. They are, as much or more than short-barreled rifles, "concealable weapon[s]" that are "likely to be used for criminal purposes." ECF 147 at PageID.720 (quoting *United States v. Stepp-Zaft,* 733 Fed. App'x 327, 329 (CA8 2018) (unpublished)).

If dangerousness alone, as measured by use in crime and homicide, was a sufficient basis to ban an arm, or to try to tax and register it out of existence, certainly handgun bans and blanket handgun registration requirements would withstand Second Amendment scrutiny. But they do not. Dangerousness is not, by

13

itself, a sufficient basis for the regulations at issue in this case as applied to Chan's possession of a short-barreled rifle or a machinegun. Those regulations withstand constitutional scrutiny only if the government can prove that short-barreled rifles and machineguns are both dangerous *and* unusual. As explained herein and in our original motion, the government has not, and cannot, meet that burden.

7.      Contrary to the government's claims, moreover, neither *Miller* nor *Heller* controls the question of whether short-barreled rifles are typically possessed by law abiding-citizens for lawful purposes. *See* ECF 147 at PageID.720-21 and 720 n.3. *Miller* "did not purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623. The case also arose from an unusual set of circumstances that should cause courts to employ great caution when evaluating any of its conclusions. "The defendants [in *Miller*] made no appearance in the case, neither filing a brief nor appearing at oral argument; the [Supreme] Court heard from no one but the government (reason enough, one would think, not to make that case the beginning and the end of [the Supreme Court's] consideration of the second amendment)." *Heller*, 554 U.S. at 623 (citing Brian L. Frye, *The Peculiar Story of United States v. Miller,* 3 NYUJLL 48, 65–68 (2008)). "The Government's brief . . . provided scant discussion of the history of the Second Amendment—and the Court was presented with no counter-discussion. As for the text of the Court's opinion itself, that discusses *none* of the history of the Second Amendment. It assumes from the prologue that the amendment was designed to preserve the militia . . . and then reviews some historical materials dealing with the nature of the militia, and in

14

particular with the nature of the arms their members were expected to possess. Not a word (*not a word*) about the history of the Second Amendment." *Heller*, 554 U.S. at 623-24.

As the Supreme Court recognized in *Heller*, *Miller* should not be seen as a "mighty rock" upon which to rest the analysis of whether short-barreled rifles are dangerous and unusual some 85 years after *Miller* was decided. *Heller*, 554 U.S. at 624. "The *Heller* test looks at what arms are 'in common use' today, not in the past." Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases—Again*, 2023 HVJLPPPC 41 (2023). Short-barrel rifles are in common use today. In fact, they are remarkably common when one considers the regulatory obstacles faced by those who wish to possess them. That they are in common use today ends the inquiry—they enjoy protection under the Second Amendment.

Similarly, the Supreme Court's dicta about short-barreled shotguns in *Heller* cannot be read as conclusively deciding the issue. None of the NFA's restrictions on any type of weapon were at issue in *Heller*. Instead, the primary issue confronting the Court was whether the Second Amendment protected an individual right to possess a firearm unconnected with service in a militia. *Heller*, 554 U.S. at 577. The Court was forced to grapple with the meaning of *Miller* largely because the dissent argued that *Miller* should be read for the proposition that the Second Amendment "protects the right to keep and bear arms for certain military purposes, but that it does not curtail the Legislature's power to regulate the nonmilitary use and

15

ownership of weapons[.]" *Heller*, 554 U.S. at 637 (Stevens, J., dissenting). The *Heller* majority rejected that broad reading, explaining that they "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625.

*Heller* did not address whether *Miller* correctly decided that short-barreled shotguns were not typically possessed by law-abiding citizens for lawful purposes. It did not discuss whether any type of short-barreled firearms are in common use by law-abiding citizens today. *Heller* did not, in fact, delve into any analysis of whether any specific weapon or firearm is left unprotected by the Second Amendment because it is dangerous and unusual. It certainly did not extend *Miller's* holding as to whether short-barreled shotguns were commonly used by militia members to include whether short-barreled rifles are commonly possessed by law-abiding citizens in the modern era.[3]

8.    Regardless of what weight the Court thinks should be placed on what *Miller* and *Heller* had to say about short-barreled shotguns, the different type of weapon involved here means that neither case controls. Today, short-barreled rifles *are* typically-possessed by law-abiding citizens for lawful purposes. Furthermore,

---

[3] Courts should also be wary of reading *Miller* and *Heller* for the proposition that weapons are unprotected by the Second Amendment if they have a military purpose. Justice Thomas has warned that a "'non-militaristic' limitation on the Arms protected by the Second Amendment seems unmoored from both text and history." *Harrel v. Raoul*, 144 S.Ct. 2491 (2024) (mem) (statement of Thomas, J.).

16

short-barreled firearms were also popular and prevalent in the era surrounding the Second Amendment's framing and ratification. Nonetheless, there was no historical regulation during any *Bruen*-relevant period that was remotely similar to the NFA's register-or-go-to-prison scheme for short-barreled rifles. Those restrictions appeared only in the 20th Century, far too late for *Bruen* purposes.

Despite *Miller's* assertion to the contrary, short-barreled firearms were used for both military purposes and self-defense during the Founding Era. Perhaps if Miller himself had been represented in any fashion during the litigation before the Supreme Court, someone would have been able to correct the Court's mistaken belief to the contrary. There is a long history of both military and civilian use of short-barreled firearms for legitimate purposes:

> Short-barrel firearms have played an integral role in military operations since firearms first appeared on the battlefield. One early example familiar to many is the blunderbuss. The blunderbuss is a flintlock shotgun, noted for its wide mouth and commonly associated with pirates.  Like modern shotguns, the blunderbuss propels multiple projectiles in a wide pattern when fired. The first reference to this firearm was in Holland in 1598, "where it [was] described as a kind of gun useful for repelling boarders on ships." These firearms, boasting very short barrels, were popular for self-defense and occasionally used by militaries, notably by navies as deck-sweepers. Military units used these and improved versions of the short-barrel shotgun and short-barrel rifles through the Civil War. In 1861, "the Federal government purchased 10,000 Augustin carbines," a short rifle initially used by cavalry units, with a 14.5-inch rifled barrel. Even during the World Wars, shotgun barrels longer than eighteen inches were only tolerated to accommodate a larger magazine tube or to aid in attaching a bayonet; they provided no increased accuracy or ergonomic benefit. The United States Military, indeed, adopted the 10.5-inch Thompson submachine gun in 1928.
>
> Today, short-barrel firearms are an essential part of the military loadout. The United States Army issues 14.5-inch M4 carbines to its

> recruits. The United States Marine Corps, which had maintained a
> twenty-inch barrel version of the M4, also recently opted to issue its
> infantry and security units the shorter M4 carbine. United States
> Marine Corps Commandant Robert Neller cited the shortened barrel,
> adjustable configuration, and reduction in weight to conclude that the
> 14.5-inch barrel M4 was tactically superior to other firearms.

James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 HVJLPP 493, 503 (2017) (internal citations omitted).

Short-barreled rifles are in common use today, and they were in common use historically. They are no more dangerous than the handguns protected in *Bruen* and *Heller*, and, were it not for the regulations at issue in this case, there is no reason to believe that they would be any less common. If the Army and the Marines choose to use short-barreled rifles because they are tactically superior, why should a citizen, concerned with self-defense, not have the right to make the same choice? The answer cannot be because those arms are so dangerous that the citizenry cannot be trusted with them. A citizen cannot be denied his fundamental right to possess an arm just because it is dangerous, particularly when the arm is no more dangerous or concealable than a handgun. Singling out short-barreled rifles is wholly arbitrary and does not fit within any historical tradition of firearms regulation. There is no reasonable basis to exclude them from the protection of the Second Amendment.

9.      Turning to machineguns, *United States v. Henry*, 688 F.3d 637 (CA9 2012), does not bear the weight that the government places on its shoulders. *See* ECF 147 at PageID.726. The Ninth Circuit's reasoning in *Henry* is clearly irreconcilable with *Bruen* and *Rahimi*. Thus, the case is no longer controlling on this Court. *See* ECF 146 at PageID.684-86. The government avers that "*Henry* did

18

not conduct an interest-balancing analysis, and the relevant aspects of its holding remain good law." ECF 147 at PageID.728. But that assertion cannot be squared with the circular reasoning that the Ninth Circuit applied in *Henry*, nor can it be squared with the similarly circular reasoning of the cases it cited to reach its faulty holding. *Henry* also cannot be squared with the Second Amendment's text, history, or tradition. Its reasoning, unexplained as it is, only makes sense as an example of the sort of interest balancing foreclosed by *Bruen*. And, perhaps most fatal of all, is that *Henry* entirely fails to discuss, much less compare, the hows and whys of our modern regulation of machineguns with any similar historical analogue. *Henry*, thus, is not properly considered precedent; it is, instead, among the many cases that *Rahimi* called out has "hav[ing] misunderstood the methodology" that the Second Amendment requires. *Rahimi*, 144 S.Ct. at 1897.

*Henry*'s explanation for why machineguns are "unusual" and, therefore, unprotected by the Second Amendment was not tied at all to any history or tradition of firearms regulation. *See Henry*, 688 F.3d at 640. The case's reasoning was not tied to history whatsoever. Nor was it tied to the text of the Second Amendment. Instead, *Henry's* conclusion that machineguns are unusual was based solely on the existence of the statute, the constitutionality of which was at issue: "A machine gun is 'unusual' because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of §922(o), has been unlawful since 1986." *Id.* Nothing in the Second Amendment analytical scheme elucidated in *Bruen* and *Rahimi* (or even *Heller* or

19

*Miller*) suggests that the existence of a firearm regulation or ban can be the source of its own constitutionality. Such reasoning is entirely circular, upholding the constitutionality of a statute banning machineguns because that statute bans machineguns. Or, said slightly differently, a statute banning machineguns is not constitutional simply because that statute bans machineguns. The existence of a statute does not demonstrate that statute's constitutionality, especially not when the relevant constitutional inquiry requires comparing the modern statute with an appropriate historical analogue and comparing the hows and whys of both the present and historical regulations. *Henry* simply fails to perform either prong of the requisite *Bruen* analysis. Thus, it is fatally inconsistent with *Bruen* and *Rahimi*.

Furthermore, none of the cases cited by the Ninth Circuit in *Henry* adds any more logical or properly reasoned light to the issue. In *United States v. Allen*, 630 F.3d 762, 766 (CA8 2011), the Eighth Circuit said no more than that the issue of whether §922(o) is an unconstitutional infringement on the Second Amendment's right to bear arms was foreclosed by its prior decision in *United States v. Fincher*, 538 F.3d 868 (CA8 2008). But, for its part, all *Fincher* said, with no analysis or explanation for the conclusion, was that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." *Fincher*, 538 F.3d at 874. The *Henry* panel's reliance on *United States v. Marzzarella*, 614 F.3d 85 (CA3 2010), was misplaced because *Marzzarella* did not involve a Second Amendment challenge to the constitutionality of banning machine

20

guns at all. Instead, the case involved the question of whether Marzzarella's conviction under 18 U.S.C. §922(k) for possessing a handgun with an obliterated serial number violated the Second Amendment. *Marzzarella*, 614 F.3d at 87. *Marzzarella* mentioned machineguns only to point out the flaws in the defendant's argument, which would have led to the conclusion that any dangerous or unusual weapon would enjoy Second Amendment protection as long as it was kept in the home. *Id.* at 94-95. To show the flaws in that argument, *Marzzarella* cited the Eighth Circuit's opinion in *Fincher* for the proposition that machineguns are dangerous and unusual weapons. That was the entirety of *Marzzarella's* analysis of the issue. *United States v. Hamblen*, 591 F.3d 471 (CA6 2009), rested on similarly shaky reasoning, finding in two short sentences that machineguns did not enjoy Second Amendment protection based only on *Heller's* dicta regarding machineguns. *Hamblen*, 591 F.3d at 474.

10.    *Rahimi* makes perfectly clear that the government has the burden to justify its regulation of any bearable arm by way of demonstrating that the how and why of its modern regulation has a comparable historical analogue animated by the same kind of how and why. *See Rahimi*, 144 S.Ct. at 1897–1898 (summarizing the government's burden); *id.* at 1898–1903 (jumping right into the historical analysis). Very little of the government's response is devoted to addressing such historical analysis. Beyond parroting the "how and why" requirement, the government does not provide a historical analogue that justifies its prosecution of Chan under either Count 1 or Court 2. As to the statutes animating Count 1, the government has not

provided a historical analogue that criminalized possession of an unregistered (the modern why) firearm and that then punished such possession with imprisonment and permanent disarmament of all firearms (the how). Nor, as to Count 2's machinegun ban, has the government produced a historical analogue that bans possession of an arm—even one deemed dangerous and unusual—(the modern why) with imprisonment as a felon, to be followed by a lifetime ban on possessing any and all kinds of firearms (the modern how). And, too, as to Count 2, the government has unearthed *no* historical analogue that treats possession of nothing more than a machinegun *part*—which here is really nothing but a twisted piece of metal—with such imprisonment and disarmament. Instead of carrying its burden on such pointed things, the government opts to muddy things up, commingling not only the how with the why, but also the different whys animating the regulations at issue here.

The why animating a regulation requiring a law-abiding citizen to register a short-barreled rifle, for example, is not at issue here and does not provide an appropriate analogue justifying the government's prosecution under Count 1. What the government must justify as to Count 1 is not the law requiring a law-abiding citizen to register a short-barreled rifle (though they fail to do even that). What the government must justify as to Count 1 is a law that imprisons and permanently disarms anyone who possesses an unregistered short-barreled rifle (even if, it bears mentioning, that person does not know that the rifle is unregistered). The why that matters as to Count 1, accordingly, is not why society thinks short-barreled rifles

22

should be registered, but why society thinks possessing an unregistered firearm needs to be regulated through our Nation's federal criminal laws. And, perhaps more importantly here, the analogue that the government digs up must not only match the modern why with the historical one, but it must also match the how. The modern how is criminalization and permanent disarmament of all types of firearms. A historical regulation that merely imposed a fine or forfeiture of a particular firearm (very different hows than imprisonment and permanent disarmament of all firearms) is not the kind of match *Rahimi* says must be found to carry the government's burden.

As to both Count 1 and Count 2, the government's response does not carry its burden. The government has, at most, demonstrated that our Nation has historically engaged in some regulation of certain firearms for limited purposes. But the mere existence of a basic regulatory regime—be it requiring licensing, registration, or accounting of some firearms, or be it prohibiting certain kinds of dangerous and unusual weapons—is not what is required. Beyond reciting some aspects of our historical regulatory tradition, the government does nothing to explain the how and why of the historical regulations it points to, much less correlate them to the how and why of the modern regulations it accuses Chan of violating. In this case, the government has done nothing more than "show" this Court the *premise* of the test that *Rahimi* reaffirmed—that we *have* a historical regulatory tradition. The government has not gone to the trouble of taking the test

that the Supreme Court has built on that premise. The government certainly has not passed that test.

11.     In accord with Chan's motion, this reply, and any further litigation on this motion, this Court should dismiss this matter, because prosecuting Chan for allegedly possessing a firearm in violation of the statutes cited in the second superseding indictment is not consistent with the Second Amendment, and because Congress lacks the power under the Commerce Clause to regulate his possession of a machinegun absent some interstate jurisdictional element.

Honolulu, Hawaii, August 12, 2024.

/s/ Craig W. Jerome
Craig W. Jerome
First Assistant Federal Defender
Jacquelyn T. Esser
Assistant Federal Defender
Attorneys for Defendant
Christopher Chan

24

## Table of Authorities

**Cases**

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (concurrence). ............................ 7, 8

*District of Columbia v. Heller*, 554 U.S. 570 (2008). .................................... 4, passim

*Ezell v. City of Chicago*, 651 F.3d 684 (CA7 2011). ................................... 5

*Garland v. Cargill*, 602 U.S. 406 (2024). ................................... 7

*Harrel vv. Raoul*, 144 S.Ct. 2491 (2024) (mem) (statement of Thomas, J.). .......... 16

*Heller v. District of Columbia*, 670 F.3d 1244 (CA DC 2011) (*Heller II*). ...... 9, 10, 11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). ............... 2, passim

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (CA2 2015). ............... 5

*Teter v. Lopez*, 76 F.4th 938 (CA9 2023). ................................... 3, 4

*Teter v. Lopez*, 93 F.4th 1150 (CA9 2024) (order granting rehearing). .................... 3

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (CA6 2016). .......................... 5

*United States v. Alaniz*, 69 F.4th 1124 (CA9 2023). ................................... 2

*United States v. Allen*, 630 F.3d 762 (CA8 2011). ................................... 20

*United States v. Fincher*, 538 F.3d 868 (CA8 2008). ......................................... 20, 21

*United States v. Hamblen*, 591 F.3d 471 (CA6 2009). ......................................... 21

*United States v. Henry*, 688 F.3d 637 (CA9 2012). ................................... 18, 19, 20

*United States v. Marzzarella*, 614 F.3d 85 (CA3 2010). ................................... 20, 21

*United States v. Miller*, 307 U.S. 174 (1939). ........................ 11–12, 14,15, 16, 17, 20

*United States v. Rahimi*, 144 S.Ct. 1889 (2024). .................... 3, 12, 18, 19, 20, 21, 23

*United States v. Stepp-Zaft*, 733 Fed. App'x 327 (CA8 2018) (unpublished). ......... 13

**Constitution**

U.S. Const., amend. II (1791). ....................................................... 2, passim.

**Statutes**

18 U.S.C. §922(k). ....................................................... 21

18 U.S.C. §922(o). ....................................................... 6, 19, 20

**Other Authority**

ATF, *National Firearms Handbook*, ch. 1, §1.11. ...................................... 5

D'Cruz, James A., *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 HVJLPP 493 (2017). ...................................... 18

Frye, Brian L., *The Peculiar Story of United States v. Miller*, 3 NYUJLL 48 (2008). ....................................... 14

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 22 (1934). ....................................... 10

Smith, Mark W., *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases—Again*, 2023 HVJLPPPC 41 (2023). ....................................... 15

## Certificate of Service

The undersigned certifies that a true and correct copy of the foregoing was served on the following by NEF when the foregoing was electronically filed in this Court on the date noted below:

Sara D. Ayabe
Rebecca A. Perlmutter
Assistant United States Attorneys

Honolulu, Hawaii, August 12, 2024.

*/s/ Craig W. Jerome*
Craig W. Jerome
First Assistant Federal Defender
Attorney for Defendant
Christopher Chan